David K. BULLOCH and Edith F. Bulloch, Plaintiffs,

v.

The UNITED STATES of America; Department of Health, Education and Welfare; Public Health Service; Frank Caprio, M.D.; The Department of Transportation; United States Coast Guard and Eugene Eichman, M.D., Defendants.

Civ. No. 78–1305.

United States District Court, D. New Jersey.

March 27, 1980.

Shapiro, Eisenstat, Capizola, O'Neill & Gabage by Gerald M. Eisenstat, Vineland, N. J., for plaintiffs.

Robert J. Del Tufo, U. S. Atty. by G. Donald Haneke, Asst. U. S. Atty., Newark, N. J., for U. S. of America.

Parker, McCay & Criscuolo by Mark M. Bridge, Mount Holly, N. J., for defendant Eugene Eichman, M. D.

OPINION

HAROLD A. ACKERMAN, District Judge.

This is a case arising from a scuba diving accident off the coast of Cape May, New Jersey, in which the plaintiff, David K. Bulloch, was injured. A complaint and libel in admiralty was filed, alleging several counts. This Court has jurisdiction under both the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–2680, and the Suits in Admiralty Act, 46 U.S.C. §§ 741 et seq., 742. The United States has moved pursuant to Federal Rule of Civil Procedure 12(b)(6) for dismissal of the Fifth Count of the complaint. This count seeks damages pursuant to the Federal Tort Claims Act for Edith F. Bulloch's loss of consortium. Because both the United States and the Bullochs have presented matters outside of the pleadings to the Court, this motion has been treated as one for summary judgment under Federal Rule of Civil Procedure 56, in accordance with Rule 12(b).

The government's argument is a simple one: Edith F. Bulloch is not David K. Bulloch's wife, therefore she is not entitled to compensation for any loss of consortium. The plaintiffs admit that they are not legally married, but respond that a legal marriage is not a required element of proof in a consortium claim. I have concluded that the plaintiffs are correct and that in New Jersey proof of a legal marriage is not an essential element of a consortium claim.

The legal question presented is a novel one. Both parties agree that New Jersey law governs this count of the complaint, but neither the parties' nor my own research has discovered a New Jersey case addressing the question. Nor has extensive research discovered a case in any other jurisdiction that considers whether a legal marriage is a prerequisite to an action for loss of consortium. The only cases discovered were a few that assumed, without discussion, that a marriage is necessary and went on to consider whether the plaintiffs had a legally recognized common law marriage. See Domany v. Otis Elevator Co., 369 F.2d 604 (6th Cir. 1966); Cooper v. Lish, 318 F.2d 262 (D.C.Cir.1963); De Vito v. Hoffman, 199 F.2d 468 (D.C.Cir.1952). None of these cases cited any authority for this assumption, although it seems to have been an assumption that was shared by the plaintiffs as well. This case, then, appears to be the first wherein a plaintiff has argued that

a legal marriage need not be shown to prevail on a consortium claim.

This case is not, however, the first to present arguments questioning common law views of unmarried couples. Recent years have seen a nationwide flurry of cases that have challenged the traditional common law conception of extra-marital relations. *See, e. g. Kremer v. Black*, 201 Neb. 467, 268 N.W.2d 582 (Sup.Ct.1978) (tort of criminal conversation retained in Nebraska); *Stanard v. Bolin*, 88 Wash.2d 614, 565 P.2d 94 (Sup.Ct.1977) (cause of action for breach of promise to marry retained in Washington); *Marvin v. Marvin*, 18 Cal.3d 660, 134 Cal. Rptr. 815, 557 P.2d 106 (1976) (nonmarital partners may enforce contracts not inextricably based on sexual relations); *Slawek v. Stroh*, 62 Wis.2d 295, 215 N.W.2d 9 (Sup. Ct.1974) (unwed father may bring suit to establish paternity, tort of seduction retained in Wisconsin, child born out of wedlock does not have cause of action against his or her parents for mental distress, etc.). The amount of scholarly commentary has risen to the point that *The Index to Legal Periodicals* (H.W. Wilson) has recently added a new category, "Unmarried Couples," to its listing. As might be expected, the New Jersey courts have been among those dealing with the various questions that have arisen from these relationships. *See, e. g. Kozlowski v. Kozlowski*, 80 N.J. 378, 403 A.2d 902 (1979) (nonmarital partners may enforce agreements not explicitly and inseparably founded on sexual services); *State v. Saunders*, 75 N.J. 200, 381 A.2d 333 (1977) (criminal fornication statute unconstitutional invasion of privacy); *Parkinson v. J. & S. Tool Co.*, 64 N.J. 159, 313 A.2d 609 (1974) (despite lack of legal marriage, *de facto* spouse qualifies as dependent under workers' compensation statute). Similarly, the common law conception of the marital relationship has not been immune to reexamination. *See, e. g., Trammel v. United States*, —— U.S. ——, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), (common law privilege precluding one spouse from testifying against the other in a criminal trial modified). In this area, as well, the New Jersey courts have actively participated. *See, e. g.,*

*Immer v. Risko*, 56 N.J. 482, 267 A.2d 481 (1970) (interspousal tort immunity abolished); *State v. Smith*, 169 N.J.Super. 98, 404 A.2d 331 (App.Div.1979) *aff'g* 148 N.J. Super. 219, 372 A.2d 386 (Cty.Ct.1977), *awaiting argument N.J. Supreme Court,* (common law rule that man may not be convicted for the rape of his wife sustained retrospectively, prospective rule declared moot since new rape statute, N.J.S.A. 2C:14–5(b) clearly permits conviction of spouse for rape). (The *Smith* case is discussed in detail in Comment, *The Common Law Does Not Support a Marital Exception for Forcible Rape*, 5 Women's Rights L.Rep. 181 (1979)).

It is not surprising that many courts have been forced to consider questions in this general area. Census data and sociological studies confirm the notion felt by many that marriage is not the sacrosanct institution that it once was and that extra-marital relations are not the anathema they once were. *See, e. g.* Bureau of the Census, United States Department of Commerce, *Marital Status and Living Arrangements: March 1979*, (Current Population Reports, Population Characteristics, Series P–20, No. 349) (1980), (2.7 million people in the United States are partners in a cohabitation situation); Clayton & Voss, *Shacking Up: Cohabitation in the 1970's*, 39 Journal of Marriage and the Family 273 (1977); *cf. Kazin v. Kazin*, 81 N.J. 85, 94, 405 A.2d 360, 365 (1979) ("Changed attitudes toward marriage and the burgeoning divorce rate, reflecting the temper of the times, have created new interpersonal problems, which have already impacted upon the courts.")

It is against this background of law and social mores in flux that this case must be considered; but it must be decided in accordance with the applicable principles of law. Although this is a case of first impression, I must begin where all law begins, with an examination of the facts.

■  Edith F. Bulloch filed an affidavit in response to the government's motion which I must accept as the facts of this case for the purpose of this motion. Fed.R.Civ.Pro.

12 & 56. As the Third Circuit stated in *Janek v. Celebrezze*, 336 F.2d 828 (3d Cir. 1964), ". . . the court must take that view of the evidence most favorable to the party against whom the motion is directed, giving to that party the benefit of all favorable inferences that might reasonably be drawn from the evidence." *Id.* at 834. *See Sanford v. O'Neill*, 615 F.2d 92 at 96 (3d Cir. 1980); *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 790 (3d Cir. 1978); *Braden v. University of Pittsburgh*, 552 F.2d 948, 966–67 (3d Cir. 1977) (en banc) (Garth, J., concurring). Here, then, is Edith F. Bulloch's description of her relationship with David K. Bulloch:

    .     .     .     .     .

2. I was married to the plaintiff, David K. Bulloch, on June 5, 1951 and together we had two children, David William Bulloch, born on November 10, 1953, and Jeanne Debra Bulloch, born on November 6, 1957.

3. The co-plaintiff and I resided together in the same household until on or about April 26, 1974. After that date we lived separate and apart and a formal Judgment of Divorce was entered on February 17, 1977 in the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. M–22793–75.

4. Despite that divorce proceeding, David K. Bulloch and I continued to communicate regularly because of the relationship which we had with our children and prior to May 21, 1977 had agreed to a reconciliation, to resume living together and ultimately to remarry.

5. On May 21, 1977, David K. Bulloch was in an accident which caused him severe injuries which is the subject matter of this litigation. He remained hospitalized at the University of Pennsylvania and then the New York University Institute of Rehabilitation Medicine until September of 1977. During that period of time, he abandoned his separate living quarters, his lease was terminated and all of his belongings were returned to our marital abode. Upon his discharge from New York University Institute of Reha-

bilitation Medicine we began residing together again at our marital home at 11 Saddle Ranch Lane, Hillsdale, New Jersey. It became apparent shortly thereafter that David was unable to have sexual relations. We considered entering into a marriage ceremony but were advised that since it was impossible for us to consummate the marital act, such ceremony would be of no effect.

6. It was our intention prior to the accident of May 21, 1977 to resume a normal marital relationship. I am the mother of David K. Bulloch's children, we have continued to reside together since September 1977 in the same household and have held each other and continue to hold each other out as husband and wife, and I consider myself the wife of David K. Bulloch.

Affidavit of Edith F. Bulloch, dated March 3, 1980.

Taking the view of this evidence most favorable to the plaintiffs, it can be said that the Bullochs have a relationship with each other that has lasted nearly thirty years. During this time there was a period of nearly three years of severe discord, leading to a divorce. Despite this discord, however, an amicable relationship existed at all times between the Bullochs concerning the upbringing of their children. A reconciliation followed quickly on the heels of the formal divorce. By the date of David Bulloch's unfortunate accident, it can be inferred that the Bullochs were engaged to be remarried and that they intimately discussed and planned their personal lives and the lives of their children. Although David Bulloch was not living with Edith Bulloch when he left his home on the day of the accident, when he next returned home after hospitalization it was to a home and bed that he shared with Edith Bulloch. For the nearly three years following the accident, the Bullochs have held themselves out as man and wife, have considered themselves to be married, and have only failed to formalize their marriage due to David Bulloch's impotence. It should be noted that their unnamed advisor incorrectly informed

them of the New Jersey law which does not require consummation. *See* Herr & Lodge, *Marriage, Divorce and Separation,* (*N. J. Practice, Vol. 10*) § 27 (1963 and supp.) Nevertheless, this incorrect view of the law appears to be sincerely held. Finally, it can be inferred that the Bullochs intend to remain together for the rest of their lives.

The question to be determined, then, is would the New Jersey courts hold as a matter of law that Edith Bulloch could not recover damages for loss of consortium if all of the above facts were proven by the preponderance of the credible evidence. In answering this question, I have taken guidance from Judge Adams' instructive opinion in *Becker v. Interstate Properties,* 569 F.2d 1203 (3d Cir. 1977), *cert. denied* 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978). In that case, Judge Adams discussed the role of federal courts in answering novel questions of state law. According to Judge Adams,

> The task of a federal court sitting in diversity is frequently not an easy one, for it must forsake its realm of expertise and assume the aspect of a court of the forum state. Even when applying well-settled law, the federal tribunal must be alert to nuances of precedent. Where, as here, a federal court is asked to pass on the implication of a declaration by a state high court of a new principle in an evolving area of the law, it must act with even greater sensitivity.

> \* \* \* \* \* \*

> Inasmuch as no New Jersey cases are squarely on point, it is important to make clear that our disposition of this case must be governed by a prediction of what a New Jersey court would do if confronted with the facts before us. Such an estimate cannot be the product of a mere recitation of previously decided cases. Rather, as in any diversity case, a federal court must be sensitive to the doctrinal trends of the state whose law it applies, and the policies which inform the prior adjudications by the state courts. A diversity litigant should not be drawn to the federal forum by the prospect of a more favorable outcome than he could expect in the state courts. But neither should he be penalized for his choice of the federal court by being deprived of the flexibility that a state court could reasonably be expected to show.

> The federal tribunal is thus obligated to follow the course that it expects New Jersey courts would adopt in similar circumstances.

> Because we are dealing here with a summary judgment, our analysis is limited to the inquiry of whether any state of facts reasonably inferable from the record could entitle the plaintiff to send the case to the jury under New Jersey law. Our disposition is also influenced by the reluctance which New Jersey courts have manifested to dismiss innovative tort claims without full development of facts at trial.

*Id.* at 1204–06 (footnotes omitted). *See* C. A. Wright, *Handbook of the Law of Federal Courts* § 58 (3d ed. 1976).

Edith Bulloch has argued that the New Jersey Supreme Court's decision in *Kozlowski v. Kozlowski,* 80 N.J. 378, 403 A.2d 902 (1979) demonstrates that the New Jersey courts have recognized the prevalence and social acceptance of cohabitation and "leads to the conclusion that the New Jersey courts would uphold the claim of a nonmarital partner for loss of consortium." Plaintiffs' brief at 4. The leap made by the plaintiff is not a self-evident one. *Kozlowski* simply held that an implied contract entered into between cohabiting parties will be enforced by the courts. The decision, even in the broadest reading, speaks only to rights and relations between unmarried partners. Consortium, however, is a cause of action which exists against tortfeasors who are strangers to the cohabitants.

Nevertheless, the *Kozlowski* decision strongly suggests that the New Jersey courts will not penalize cohabitants. According to the *Kozlowski* court:

> The philosophy expressed in *Marvin* which refuses to condemn cohabitation by a man and woman who are unmarried as being "meretricious" and, therefore, so

tainted as to deny them any relief by the courts, is not generally contrary to our own public policy. In *State v. Saunders*, 75 N.J. 200, 381 A.2d 333 (1977), we held the fornication statute (N.J.S.A. 2A:110–1), as applied to adults, to be unconstitutional because it improperly invaded the parties' right to privacy—thus indicating such conduct is not criminal. . . .
[T]he cohabitation by the parties after 1968 cannot be termed "meretricious" because they engaged in sexual relations. Moreover, the relationship between the parties hereto as entered into in 1968 at a time when plaintiff was divorced, was not tainted by the fact that defendant was married at that time. A male, married or unmarried, can be guilty of adultery only if he has sexual relations with a married woman. [citations omitted] Therefore, in the instant case, leaving aside one's moral or religious beliefs, there was no legal impediment to the parties cohabiting in 1968. Thus any lawful agreement made by them is enforceable.

80 N.J. at 386–87, 403 A.2d at 907.

*Kozlowski*, then, is strong authority for the proposition that the relationship existing between the Bullochs is a lawful one in New Jersey. The New Jersey Supreme Court's reliance on its earlier decision in *State v. Saunders*, 75 N.J. 200, 381 A.2d 333 (1977) reinforces the idea that New Jersey citizens are not penalized by the state courts for consensual extramarital sexual relations. In *Saunders* the New Jersey Supreme Court strongly rejected the argument that a proper purpose of the criminal law was to protect the marital relationship and the public morals:

> The last two reasons offered by the State as compelling justifications for the enactment—that it protects the marital relationship and the public morals by preventing illicit sex—offer little additional support for the law. Whether or not abstention is likely to induce persons to marry, this statute can in no way be considered a permissible means of fostering what may otherwise be a socially beneficial institution. If we were to hold that the State could attempt to coerce

people into marriage, we would undermine the very independent choice which lies at the core of the right of privacy. We do not doubt the beneficent qualities of marriage, both for individuals as well as for society as a whole. Yet, we can only reiterate that decisions such as whether to marry are of a highly personal nature; they neither lend themselves to official coercion or sanction, nor fall within the regulatory power of those who are elected to govern.

> This is not to suggest that the State may not regulate, in an appropriate manner, activities which are designed to further public morality. Our conclusion today extends no further than to strike down a measure which has as its objective the regulation of *private* morality. To the extent that N.J.S.A. 2A:110–1 serves as an official sanction of certain conceptions of desirable lifestyles, social mores or individualized beliefs, it is not an appropriate exercise of the police power.

*Id.* at 219, 381 A.2d at 342 (footnote omitted).

*Saunders*, of course, involved a criminal statute while consortium is a civil action at common law. *Saunders* held that the state may not criminally punish activity like that engaged in by the Bullochs; it did not hold that the State could not deny a civil remedy to people like the Bullochs.

It is certainly true that if a cause of action for loss of consortium is denied to Edith Bulloch it could be viewed as a punishment for lack of a legally recognized marriage. Such a conclusion would, of course, be based on the assumption that if the facts of the Bullochs' relationship were identical to the facts at bar with the sole exception that a legal marriage existed, then her cause of action would go unchallenged. This assumption, incidentally, has been present in the arguments of all parties to this case although, as I will discuss later, it is not necessarily an accurate assumption. Taking this view of the case suggests that denial of the cause of action would be con-

trary to the spirit of *Kozlowski* and *Saunders*. *Cf. Lynn v. Lynn*, 165 N.J.Super. 328, 398 A.2d 141 (App.Div.), *certif. denied* 81 N.J. 52, 404 A.2d 1152 (1979) (adultery is not *per se* bar to award of alimony).

There is another way of viewing the problem, however. That is that it is only because marital relations are viewed with approbation that a cause of action for loss of consortium is recognized and damages to that relationship are compensable. Viewed in this light, denial of a cause of action for lack of consortium is not a penalty, it is simply a manifestation of the state's policy to reward marriage while it simultaneously treats cohabitation as a neutral state, *i. e.*, something that is to be neither rewarded nor penalized.

There is also a third view. The New Jersey courts may determine that the purpose of tort law is to compensate the people whose injuries are proximately caused by tortious conduct and that concepts of reward and punishment related to a person's marital state are irrelevant to a consideration of who is entitled to compensation.

Determining which view of the question will prevail in the New Jersey courts is necessarily dependent on the inferences and nuances that can be drawn from New Jersey's law of consortium and torts in general, as well as upon such cases as *Kozlowski* and *Saunders*.

The logical place to begin a search for the answer to this question is with the leading modern case on the tort of consortium in New Jersey, *Ekalo v. Constructive Service Corporation of America*, 46 N.J. 82, 215 A.2d 1 (1965). In *Ekalo*, the New Jersey Supreme Court held that a cause of action for loss of consortium is available to a married woman as well as to a married man. In so holding, the court made it clear that consortium was no longer based upon the original common law view that a husband was entitled to compensation because of his property interest in his wife's services. *Id.* at 85, 215 A.2d 1. Instead the court adopted the modern view that the tort compensated for loss of services, aid, comfort and conjugal fellowship. *Id.* at 90, 215 A.2d 1.

Significantly, the court held that recovery was available even when damages had not occurred to all four of these items. *Id.* The *Ekalo* court did not discuss the question of whether a legal marriage is a prerequisite to a claim for loss of consortium. Insofar as marriage was discussed, the discussion centered on whether a woman's marital state prevented her from bringing a claim because her legal identity was submerged into her husband's. *See Id.* at 86, 215 A.2d 1. The court, following the lead of the D.C. Circuit's opinion in *Hitaffer v. Argonne Co.*, 87 U.S.App.D.C. 57, 183 F.2d 811 (D.C. Cir.), *cert. denied* 340 U.S. 852, 71 S.Ct. 80, 95 L.Ed. 624 (1950), rejected this contention and held that a wife could sue for the loss of her husband's services.

The *Ekalo* court also rejected a number of other arguments offered by the defendants against the extension and/or continuation of the tort action for lack of consortium. These arguments included lack of proximate cause, 46 N.J. at 89–90, 215 A.2d 1, the danger of double recovery, *Id.* at 90–92, 215 A.2d 1, and the inordinate expansion of a defendant's liability for tortious conduct, *Id.* at 92–95, 215 A.2d 1. In the latter regard the court wrote that

A handful of courts recognizing the incongruity of denying the wife's claim while continuing the husband's claim for loss of consortium, have chosen to reject both claims. [citations omitted] We are not disposed towards that course for we consider that its taking would be in disregard of the pertinent policy considerations; those considerations have been repeatedly voiced in recent decisions expanding tort liability in the just effort to afford decent compensatory measure to those injured by the wrongful conduct of others.

\*　　\*　　\*　　\*　　\*　　\*

In the ultimate, the acceptance or rejection of the wife's consortium claim must be rested on sound policy considerations and a proper balancing of the interests concerned. While engaging in their activities, the defendants clearly came under the comprehensive common law

duty of due care with tort liability for its breach. If, as alleged, they acted without due care causing serious bodily injury to the husband and consortium deprivation to the wife, they should, in all justice, be held liable in fair measure for the respective losses. Those losses were immediate and consequential rather than remote and unforeseeable, and there being no sufficient countervailing policy, the law now rightly views them as remediable by the responsible tortfeasors.

*Id.* at 93, 95, 215 A.2d 7–8.

There can be little doubt that New Jersey continues to adhere to the policy expressed in *Ekalo* of expanding tort liability to justly compensate those who are injured. *Cf. Suter v. San Angelo Foundry & Machine Co.,* 81 N.J. 150, 406 A.2d 140 (1979) (policy considerations mandate legal conclusion that contributory negligence is no defense to strict liability suit brought by factory worker). *Ekalo* specifically states, however, that this policy consideration must give way if there is a sufficient countervailing policy. The question becomes, then, whether the policy in favor of marriage in New Jersey is strong enough to prevent a cohabitant from presenting a claim for loss of consortium where a spouse could.

There can be no doubt that the courts and legislature of New Jersey share this court's opinion that marriage is a "socially beneficial institution". *Saunders,* 75 N.J. at 219, 381 A.2d 333. As the California Supreme Court stated in *Marvin v. Marvin,*

. . . the structure of society itself largely depends upon the institution of marriage . . . . The joining of the man and the woman in marriage is at once the most socially productive and individually fulfilling relationship that one can enjoy in the course of a lifetime.

18 Cal.3d at 683, 134 Cal.Rptr. at 831, 557 P.2d at 122 *quoted in Kozlowski,* 80 N.J. at 386, 403 A.2d 902. *See also State v. Saunders,* 72 N.J. 200, 219–220, 381 A.2d 333 (1977). While it is clear from the *Kozlowski* opinion that the New Jersey courts will not deny judicial relief to people simply because they cohabit, 80 N.J. at 387, 403 A.2d 902, it

is also clear that New Jersey requires a license and legally recognized ceremony before a couple can be considered to be married, N.J.S.A. 37:1–10.

I do not believe, however, that the New Jersey courts would interpose this policy favoring marriage between a cohabitant and a tortfeasor. There simply seems to be no reason to allow a tortfeasor to benefit from the policy favoring marriage and, in the ultimate analysis, only tortfeasors would benefit from such a holding.

The recent decisions in *Kozlowski* and *Saunders* have made it clear that a relationship like the one existing between the Bullochs is a lawful one. It seems obvious that a member of a cohabiting couple can suffer identical damage to that suffered by a spouse when his or her mate is injured. *Cf. Ekalo,* 46 N.J. at 93, 215 A.2d 1 (describing the injury suffered by a wife); Stafford, Backman & Dibona, *The Division of Labor Among Cohabiting and Married Couples,* 39 Journal of Marriage and the Family 43 (1977) (similar roles predominate in both types of relationships). The strong New Jersey policy of compensating those whose injuries are proximately caused by the tortious conduct of others would seem to outweigh the policy favoring marriage. The fact that a cohabitant suffers as much as a spouse would prevent the courts from remaining neutral towards the relationship. Decisions like the one in *Suter v. San Angelo Foundry & Machine Co.,* 81 N.J. 150, 406 A.2d 140 (1979), indicate that the New Jersey courts favor a realistic view of a plaintiff's situation over abstract legal principles. *Cf. State v. Baker,* 81 N.J. 99, 108–09, 405 A.2d 368, 372 (1979) (non-related "extended family" may reside in single family zone. "As long as a group bears the 'generic character of a family unit as a relatively permanent household,' it should be equally as entitled to occupy a single family dwelling as its biologically related neighbors.") Recognizing an action for loss of consortium in circumstances like those at bar only means that tortfeasors will compensate more fully for the actual damage caused. It does not mean that the marital relation-

ship is devalued. While many considerations may lead to marriage, I doubt many decide to marry because they want to have a cause of action for loss of consortium. Deciding against a cause of action for cohabitants, therefore, is unlikely to encourage people to wed. Realistically, both married couples and cohabitants dread the possibility of injury to their mate and suffer when that injury occurs. It is the suffering of the mate of the physically injured plaintiff that the tort compensates. *Ekalo*, 46 N.J. at 93–94, 215 A.2d 1.

It is true that the New Jersey courts have rejected the claim that a new cause of action, similar to loss of consortium, should be created for the benefit of minor children. *Russell v. Salem Transportation Co., Inc.*, 61 N.J. 502, 295 A.2d 862 (1972). In so holding, the court began by noting that the relationship between parent and child is different in kind from the relationship between spouses. *Id.* at 505–506, 295 A.2d 862 *quoting Ekalo*, 46 N.J. at 92, 215 A.2d 1. Of course there are no such differences in the present case, since Edith Bulloch alleges injuries identical to those suffered by a spouse. The *Russell* court, however, did not bottom its decision on the different types of relationships that exist, but rather on "[s]everal considerations of policy, taken cumulatively." *Russell*, 61 N.J. at 506, 295 A.2d at 864.

The first of these considerations was the court's view that allowing claims of this sort by minors would lead to "a substantial accretion of liability against the tortfeasors arising out of a single transaction" since a spouse's claim only involves the joining of one companion claim while allowing children to bring suit would add a significantly larger number of claims to the litigation. The court concluded that

> Magnification of damage awards to a single family derived from a single accident might well become a serious problem to a particular defendant as well as in terms of the total cost of such enhanced awards to the insured community as a whole.

*Id.* at 506, 295 A.2d at 864. This policy concern is somewhat involved in the case at bar. Recognition of a cohabitant's claim for loss of consortium will mean that some people who were unable to obtain compensation for their injuries in the past will be able to obtain compensation in the future. This may, in turn, lead to some rise in insurance rates, but any such rise would be minor in comparison with the rise that might be expected to follow recognition of a cause of action for children. Children are more numerous than cohabiting couples, and would bring more claims. In the present case, for example, David Bulloch has two children who could present such a claim, but he has only one partner in cohabitation. More importantly, at least in terms of this policy concern, cohabiting couples represent a very small percentage of all couples. According to the Bureau of the Census, "the partners in unmarried couples represented only about three percent of all persons among couples living together in 1979." Bureau of the Census, United States Department of Commerce, *Marital Status and Living Arrangements: March 1979* (Current Population Characteristics, Series P–20, No. 349) 3 (1980). This represents approximately 2.7 million people. *Id.* By way of contrast, in March 1979 there were 62,389,000 children under 18 years of age in America, excluding those who were heads or spouses of heads of families and subfamilies. *Id.* at 26 (Table 4). Of these, 99% live in situations that might give rise to a lawsuit of the type rejected in *Russell*. *Id.* It seems obvious that the cost of permitting children to bring suit is very much higher than the cost of permitting a cohabiting partner to bring suit. This argument was also rejected in *Ekalo*, where the more numerous group of wives presented their claim. 46 N.J. at 92, 215 A.2d 1. Accordingly, I do not think that this concern would weigh heavily on a New Jersey court's mind.

The *Russell* court's second policy concern was the practical consideration that the effect of a parent's injuries on children is frequently reflected in jury verdicts, even without recognition of a new cause of action. The court therefore felt that there was no social need for the recognition of

the new cause of action, since the damages were already largely compensated for under existing law. 61 N.J. at 507, 295 A.2d 862. Such concerns are inapplicable in the present case since, unless Edith Bulloch is permitted to present her case, the jury will have no way of compensating her for her injury. As the *Ekalo* decision held, loss of consortium is a claim separate and apart from the spouse's claim. 46 N.J. at 90–91, 215 A.2d 1.

*Russell's* third policy concern stemmed from various legal and practical difficulties that it perceived as arising from a minor's relationship to his or her parents. These concerns obviously have no bearing to the question before me today, since Edith Bulloch is an adult who stands before this court as an equal to David Bulloch. *See Peper v. Princeton University Board of Trustees*, 77 N.J. 55, 76–80, 389 A.2d 465 (1978).

The court's final concerns were "problems of remoteness and speculativeness of damage claims in this area." The problem of remoteness is irrelevant to a claim for loss of consortium since the *Ekalo* court clearly held that such injuries are proximately caused by tortious injury to the spouse. 46 N.J. at 89–90, 95, 215 A.2d 1. As to the speculativeness of Edith Bulloch's claim, the factfinder in this case will have a thirty-year long relationship to consider, including almost three years spent together after the accident. Under such circumstances, a verdict would be no more speculative than in the case of a man and wife. Indeed, many newly-married couples have undoubtedly recovered for loss of consortium under circumstances where the factfinder had less information to base its decision upon.

The policy concerns of *Russell* do not, therefore, present a bar to recognition of Edith Bulloch's claim. It should also be noted that where *Russell* was considering the creation of a new cause of action, the present case only presents the question of whether a cohabiting person qualifies as a plaintiff in an already existing cause of action. A decision in Edith Bulloch's favor does not create a tort action for loss of consortium, it simply concludes that she has standing to bring such a claim.

For all of the above reasons, and especially New Jersey's tradition of viewing its citizens' tort claims realistically and empathetically, and its policy of compensating those injured by tortious conduct, I conclude that the New Jersey courts would permit a cohabitant who has suffered the same types of injuries as a spouse to bring an action for loss of consortium.

The fact that this is a novel conclusion would not prevent the New Jersey courts from so holding, as they have repeatedly taken a flexible view of the common law. As the *Ekalo* court stated, "since the earlier ruling of nonliability was judge-made, it could, under settled principles of common law, readily be changed by judges to meet changing concepts and times." 46 N.J. at 94, 215 A.2d at 8 *citing Smith v. Brennan*, 31 N.J. 353, 157 A.2d 497 (1960); *Collopy v. Newark Eye and Ear Infirmary*, 27 N.J. 29, 141 A.2d 276 (1958) and other cases. This principle was recently reaffirmed by the appellate division in *State v. Smith*, 169 N.J.Super. 98, 100, 404 A.2d 331 (1979) *awaiting argument in the N.J. Supreme Court.*

Thus far, this opinion has proceeded upon the assumption that the only bar to Edith Bulloch's recovery is the lack of a marriage license. I have just concluded that that disability would not bar a suit for loss of consortium in New Jersey. The question remains to be examined as to whether a spouse in Edith Bulloch's circumstance would be entitled to recover. In particular, does the undisputed fact that she was not living with David Bulloch on the day of the accident bar her from recovery. I have been able to find no cases discussing the question of whether spouses living apart are entitled to recover for loss of consortium, so it seems best to consider the definition of the tort in order to find an answer. In *Ekalo* the New Jersey Supreme Court held that a successful action for loss of consortium compensates a plaintiff for loss of a spouse's services, aid, comfort and conjugal fellowship and that a plaintiff need not have lost all of these items in

order to bring a successful suit. 46 N.J. at 90, 215 A.2d 1. *See Zalewski v. Gallagher*, 150 N.J.Super. 360, 372, 375 A.2d 1195 (App. Div. 1977). I have concluded that a person who, as a result of tortious conduct, loses services, aid, comfort and conjugal fellowship of the type typically shared by spouses is entitled to recover for loss of consortium. Reading Edith Bulloch's affidavit in the most favorable light, it seems clear that she lost all or some of these items. For example, she seems to have lost the assistance of David Bulloch in raising their children during the time he was in the hospital. In an action brought either by a spouse or a cohabitant, the question of actual damage and degree of damage must be left to the factfinder. In today's world, spouses occasionally live apart, yet it would be foolish to suggest that it logically follows from that fact alone that services, aid, comfort and conjugal fellowship are not present in the relationship. I have already noted that the factfinder in this case will have sufficient evidence from the thirty-year relationship of the Bullochs to properly evaluate Edith Bulloch's claim without undue speculation. My decision today only means that Edith Bulloch can present her case. It does not mean that she will be successful in her claim. I hasten to add, however, that neither a cohabitant nor a spouse should be compensated through a tort action for loss of consortium when the proximate cause of the loss is not the defendant's tortious conduct, but rather discord in the relationship or the personal preferences of the people involved.

Finally, I would like to mention that I do not believe that my decision today will lead to a vast amount of frivolous litigation whenever an injured party has engaged in a fleeting escapade. I have confidence that judges and juries are capable of separating wheat from chaff and that the bar is sufficiently aware of this fact to prevent its wasting time with frivolous claims. *See Falzone v. Busch*, 45 N.J. 559, 566–567, 214 A.2d 12 (1965).

In sum, the government's motion for dismissal of Edith Bulloch's claim for loss of consortium is denied.

The Government will submit an order in conformance with this opinion within five days.