[Civ. No. 29076. Fourth Dist., Div. Two. Jan. 11, 1983.]

RALPH LLOYD BUTCHER III, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
CYNTHIA LYNN FORTE, Real Party in Interest.

**COUNSEL**

Parker, Stanbury, McGee, Babcock & Combs, Robert J. Moss and Robert A. Walker for Petitioner.

No appearance for Respondent.

Memel, Jacobs, Pierno & Gersh, Stanley K. Jacobs and Theresa M. Marchlewski for Real Party in Interest.

**OPINION**

**TROTTER, J.***—This case involves a unique and interesting issue: whether the "spouse" in a nonmarital cohabitation arrangement may state a cause of action for loss of consortium when the other "spouse" is injured by a third party.

### FACTS

Paul Forte was walking across the street when he was allegedly struck by Ralph Butcher's Volkswagen. Paul suffered a fractured neck, forearm and leg, and a severe cerebral contusion. Paul sued Butcher for personal injuries. Cindy Forte sued as Paul's wife for loss of consortium with Paul.

---

*Assigned by the Chairperson of the Judicial Council.

In pretrial discovery, Butcher learned that Cindy and Paul did not have a valid legal marriage, although Cindy testified at her deposition that she and Paul had a "common law" marriage.

Paul and Cindy began living together on September 11, 1969. Since that time, Cindy has used the name Forte. At the time of the accident, March 28, 1981, Paul and Cindy had been living together as husband and wife for 11½ years. They had two children together, filed joint income tax returns, and maintained joint savings and checking accounts. Paul acknowledges and refers to Cindy as his wife. Cindy testified that she and Paul had a common law marriage, and she considered them to be married as of September 11, 1969.

Upon learning that there had been no valid legal marriage between Cindy and Paul, Butcher moved for summary judgment on Cindy's claim for loss of consortium. After argument, the trial court denied the motion for summary judgment. Defendant Butcher now petitions this court for a writ of mandate to compel the trial court to grant the motion for summary judgment.

## DISCUSSION

### 1. *Theory of Consortium Cause of Action*

■ Butcher argues that there can be no claim for loss of consortium without a valid legal marriage because the right to consortium grows out of the marriage.

The notion that a valid legal marriage is a prerequisite to the cause of action for loss of consortium has its origin in the common law view that the wife was more or less a servant or chattel of the husband, and that therefore he was entitled to an independent cause of action if the wife were injured, since the tortfeasor would have damaged the husband's property rights in the services and society of the wife. (See, e.g., *Chicago, B. & Q. R. Co.* v. *Honey* (8th Cir. 1894) 63 F. 39.)

The theory of the cause of action for loss of consortium has changed, however, since its early common law statement of proprietary entitlement. The wife is no longer a chattel or servant. The element of loss of services is no longer the essence of the cause of action. The real damage is to what may be called a relational interest. An interference with the continuance of the relation, unimpaired, may be redressed by a tort action. (Prosser, Torts (4th ed. 1971) § 124, p. 873.)

There are many evidences of a shift from the proprietary entitlement theory of consortium to a relational interest theory. First were the cases which finally allowed the wife as well as the husband to state a claim for loss of consortium.

The rule that the husband alone had such a cause of action has "no other justification than that of history . . . . The loss of 'services' is an outworn fiction, and the wife's interest in the undisturbed relation with her consort is no less worthy of protection than that of the husband." (Prosser, *supra*, § 125, pp. 894-895.)

The cases cited by Butcher for the proposition that a valid legal marriage is a prerequisite to a cause of action for loss of consortium involve injuries which occurred *before* the marriage. While some of the cases simply couple the chattel notion with a sort of caveat emptor doctrine (the husband takes the wife "as is," and cannot recover for the premarital injury (*Georgia Northern Ry. Co.* v. *Sharp* (1917) 19 Ga.App. 503 [91 S.E. 1045]; *Booth* v. *Baltimore & O. R. Co.* (1915) 77 W.Va. 100 [87 S.E. 84]), other cases seem to recognize the relational interest involved. For example, in *Donough* v. *Vile* (1947) 61 Pa. D. & C. 460, the wife had been injured before the marriage. The court held that the husband had no cause of action for loss of consortium. "Damages for the loss of consortium are intended to compensate for an injury done to the connubial relationship. It would therefore appear that where the marriage relationship does not exist at the time of the tort, a cause of action cannot be created by a marriage subsequent thereto." (*Id.*, at pp. 461-462.)

This is no more than to state that the cause of action protects the parties' relational interest, and if the relationship did not exist at the time of the tort, a fortiori it could not be injured. In fact, application of this principle to all of the premarital injury cases would lead to the same result in each case. If the injury occurs before the relationship is established, when the parties are engaged, or acquainted, or perhaps total strangers to one another, then the interest in continuing the relationship undisturbed has not been injured.

While limiting the type of relationship recognized to a legal marriage, the court in *Sawyer* v. *Bailey* (Me. 1980) 413 A.2d 165, at page 167 stated that "the law is concerned with the protection of the 'relational' interests of married persons and recognizes as an actionable tort any interference, intentional or negligent, with the *continuation* of the relation of husband and wife, such as the right to damages for the loss of consortium of either one of the spouses." (Italics in original.) The court further recognized that "as a common law court we have the power to grant a new cause of action for the redress of rights, or, as requested by the plaintiff in the instant case, to expand the cause of action for the recovery of damages for loss of consortium in a tortious injury case so as to encompass parties who are engaged to marry at the time of the tortious incident and who thereafter do marry. [¶] . . . We recognize that the plaintiff had an inchoate expectation that third persons would use reasonable care in relation to the person of his fiancée so that his prospective marital rights would not be infringed. Although our society regards it of the highest primacy that a remedy be

afforded for the redress of wrongs caused by tortious conduct [citation], nevertheless, we discern countervailing policy factors which persuade us to confine consortium rights to cases where the tortious injury occurred while the parties were married, one to the other." (*Ibid.*)

Thus, while refusing to extend the doctrine beyond the bounds of legal marriage for policy reasons, courts have clearly recognized and redefined the theory of the tort to be an interference with the continuation of the relational interest.

### 2. *Policy Arguments*

We next address the argument that, even recognizing an unmarried person's interest in the continuation of the relationship with the nonmartial partner (*Sawyer* v. *Bailey, supra,* 413 A.2d 165), policy reasons dictate limiting those interests to the legally married. Recent cases speak in terms of judicial line-drawing; whether the line should be drawn to include or exclude the interest of a nonmarital cohabitant.

Some policy considerations which would arguably limit recognition of the relational interest to legally married couples are: (a) lack of precedent for extending the cause of action to unmarried couples, (b) the injury to the unmarried partner is too indirect, (c) the damages would be too speculative, (d) there is a danger of double recovery, (e) the cause of action would be extended to other classes of plaintiffs, and (f) public policy favors marriage.

The argument that recovery for loss of consortium in a nonmarital relationship breaks new ground and is without precedent, or that it should be left to legislative action "[i]n effect . . . is a request that courts abdicate their responsibility for the upkeep of the common law. That upkeep it needs continuously, as this case demonstrates." (*People* v. *Pierce* (1964) 61 Cal.2d 879, 882 [40 Cal.Rptr. 845, 395 P.2d 893].)

"In California as in other jurisdictions of Anglo-American heritage, the common law 'is not a codification of exact or inflexible rules for human conduct, for the redress of injuries, or for protection against wrongs, but is rather the embodiment of broad and comprehensive unwritten principles, inspired by natural reason and an innate sense of justice and adopted by common consent for the regulation and government of the affairs of men. . . . [¶] The inherent capacity of the common law for growth and change is its most significant feature. Its development has been determined by the social needs of the community which it serves. It is constantly expanding and developing in keeping with advancing civilization and the new conditions and progress of society, and adapting itself to the gradual change of trade, commerce, arts, inventions, and

the needs of the country.' " (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 393-394 [115 Cal.Rptr. 765, 525 P.2d 669]; 15A Am.Jur.2d, Common Law, §§ 1, 3, pp. 594-596, 597-598.)

"This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law." (*Hurtado* v. *California* (1884) 110 U.S. 516, 530 [28 L.Ed. 232, 237, 4 S.Ct. 111, 118].)

"But that vitality can flourish only so long as the courts remain alert to their obligation and opportunity to change the common law when reason and equity demand it: 'The nature of the common law requires that each time a rule of law is applied, it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Whenever an old rule is found unsuited to present conditions or unsound, it should be set aside and a rule declared which is in harmony with those conditions and meets the demands of justice.' (Fns. omitted.) (15[A] Am.Jur.2d, Common Law, [§ 3], p. [599].) Although the Legislature may of course speak to the subject, in the common law system the primary instruments of this evolution are the courts, adjudicating on a regular basis the rich variety of individual cases brought before them." (*Rodriguez* v. *Bethlehem Steel Corp.*, *supra*, 12 Cal.3d 382, 394.)

At the time the first case extended the cause of action to wives as well as husbands, there was utterly no precedent for such an expansion. As the court stated in *Hitaffer* v. *Argonne Co.* (D.C.Cir. 1950) 183 F.2d 811, at pages 812-813: "[W]e are not unaware of the unanimity of authority elsewhere denying . . . recovery under these circumstances. . . . But after a careful examination of these cases we remain unconvinced that the rule which they have laid down should be followed . . . . On the contrary, after piercing the thin veils of reasoning employed to sustain the rule, we have been unable to disclose any substantial rationale on which we would be willing to predicate a denial of [an] action for loss of *consortium* [in these circumstances]." (Italics in original; *Hitaffer* v. *Argonne Co.*, *supra*, 183 F.2d 811, 812-813, overruled on other grounds in *Smither and Company, Inc.* v. *Coles* (D.C.Cir. 1957) 242 F.2d 220.)

The Michigan Supreme Court in *Montgomery* v. *Stephan* (1960) 359 Mich. 33 [101 N.W.2d 227, 235], rejected a long line of precedents denying the wife's cause of action, stating that the old rule was "out of harmony with the conditions of modern society. They do violence to our convictions and our principles. We reject their applicability. The reasons for the old rule no longer obtaining, the rule falls with it. The obstacles to the wife's action were judge-invented and they are herewith judge-destroyed."

The New York Court of Appeals in *Millington v. Southeastern Elevator Co.* (1968) 22 N.Y.2d 498 [293 N.Y.S.2d 305, 239 N.E.2d 897], stated: " 'We act in the finest common-law tradition when we adapt and alter decisional law to produce common-sense justice. . . . Legislative action there could, of course, be, but we abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule.' " (At p. 313.)

When it is determined that the common law or judge-made law is unjust or out of step with the times, we should have no reluctance to change it. (*City of Glendale v. Bradshaw* (1972) 108 Ariz. 582 [503 P.2d 803, 805].) The law is not, nor should it be, static. It must keep pace with changes in our society since it was never intended for the doctrine of stare decisis to be cast in iron. (*Gates v. Foley* (Fla. 1971) 247 So.2d 40, 43.)

This brief review of authorities enforces our view of the common law as an ever-changing malleable body of law distinguished by its ability to adapt to changing times and issues.

With these general principles in mind, we next look at the state of applicable precedent in California. *Rodriguez v. Bethlehem Steel Corp.* (1974) *supra,* 12 Cal.3d 382, was the first case to allow a wife's claim for loss of consortium. As pointed out above, *Rodriguez* placed special emphasis on the capacity of the common law to grow and change. The court went on to hold that the prior rule of the common law, denying the wife's right to claim for loss of consortium, no longer had any justification.

In *Borer v. American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858], the California Supreme Court was faced with the claim of a child for loss of parental consortium. The court denied recovery for loss of consortium in the parent-child context, largely because the spousal relationship is different in kind from the parent-child or other relationships, and to avoid the hopeless task of limiting tortfeasor liability if every foreseeable relationship were covered.

In *Tong v. Jocson* (1977) 76 Cal.App.3d 603 [142 Cal.Rptr. 726], the parties became engaged in September and began living together in November. The wife was injured after they had been living together for about three months. They were married within one month after the injury. The court denied the husband's claim for loss of consortium based on the premarital injury to the wife. The court relied on the language of *Borer* that " '[S]omewhere a line must be drawn,' " and then stated simply that "Plaintiff and Gale were not married at the time of the vehicle accident. Under the facts of the case before us, an action for loss of consortium cannot be maintained." (*Id.,* at p. 605.)

Most recently, the Third District decided *Etienne* v. *DKM Enterprises, Inc.* (1982) 136 Cal.App.3d 487 [186 Cal.Rptr. 321]. In that case a couple had been cohabiting in California for eight years. They made occasional visits to Texas. The husband was injured and the wife claimed loss of consortium on the basis that the couple had a valid common law marriage under Texas law. The court held that occasional visits to Texas did not meet the requirements of the Texas common law marriage statute, and that there is no common law marriage under California law. The court denied the wife's claim for loss of consortium on those grounds.

Butcher argues that these California precedents require that the cause of action for loss of consortium be restricted to validly married persons. We disagree.

*Rodriguez* in particular emphasizes the duty of the courts to adapt the common law to changed circumstances where justice requires. The California Supreme Court specifically rejected the arguments against the wife's cause of action that injury to the wife was too remote, that the measure of damages was too speculative, or that allowing the claim would open the floodgates to everyone related to the victim. These are the same arguments advanced against the unmarried cohabitant's claim, and are equally unpersuasive in that context, as we shall discuss hereafter.

*Borer* emphasized that the spousal relationship was different from the parent-child relationship or other types of relationships. In contrast, the relationship of unmarried cohabitants bears every resemblance to the spousal relationship, including the sexual aspect absent from other relationships, except that the relationship has not been solemnized by a formal marriage ceremony.

*Tong* is strictly limited to its facts. The couple was engaged, not yet married, and had been living together only a short time. Despite the added element of cohabitation, at the time of accident the relationship was of such a short duration that the court could not say the relationship had become sufficiently established to recognize the relational interest. The *Tong* court relied heavily on the language of *Borer* that a line must be drawn to limit liability. However, the court's reliance on *Borer* was misplaced, since the key to the *Borer* court's analysis was the crucial distinction between an action for loss of sexual consortium and an action for loss of parental consortium. Moreover, the problem of multiple actions in a case of parental consortium would not be present in the context of loss of consortium between spousal or cohabiting parties.

Finally, in *Etienne,* the court and the parties presumed for the purpose of that case that a valid marriage was required, and the court confined its discussion to a determination of the issue of whether the parties were validly married. The

court simply did not address the issue, and did not state any reasons to support a rule that a valid marriage is a prerequisite to stating a cause of action for loss of consortium.

Thus, our review and analysis of the existing California cases compel us to conclude no precedent exists for the conclusion that an unmarried cohabitant may not state a claim for loss of consortium. The issue has not been directly addressed and we refuse to extend *Tong* beyond its stated facts.

In fact, in terms of precedent, only one case has ever directly addressed the issue of loss of consortium with respect to unmarried cohabitants. That case is *Bulloch* v. *United States* (D.N.J. 1980) 487 F.Supp. 1078, and there the court *allowed* the cohabitant wife's claim for loss of consortium.

In *Bulloch,* the cohabitants had been married for 20 years and were divorced. Shortly after the divorce was final, they agreed that they would reconcile and resume living together. Before they began living together again, the husband was injured. When he was discharged from the hospital, he moved back into the family home and the wife took care of him. From the time the husband moved back into the family home, the couple held themselves out as husband and wife. The federal court, purporting to apply New Jersey state law, held that the wife could maintain a cause of action for loss of consortium. The major factors weighing in the court's decision were: (1) that the policy of tort law is to compensate for injury, and that reward or punishment for a person's marital status is not relevant in assessing tortfeasor liability, (2) increasing court criticism of the traditional common law view of nonmarital relations, (3) public policy implications of two New Jersey cases that cohabitation should not be penalized, (4) similarities between the cohabitant's claim and the cases allowing the wife's right to sue for loss of consortium, (5) the similarities between cohabitation and marriage, and the dissimilarities of spousal-type relationships and other relationships like the parent-child relationship, and (6) the strong evidence of a nearly 30-year relationship upon which the court could evaluate the claim.

Although *Bulloch* is open to criticism for ignoring some prior New Jersey cases and as an inaccurate attempt to predict the direction state law would take, nevertheless, many of the reasons given by the *Bulloch* court are persuasive in finding that an unmarried cohabitant may state a cause of action for loss of consortium. The court accurately assessed the policy of tort law to compensate for injury and redress wrongs. Moreover, after cases like *Marvin* v. *Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106] and *Ekalo* v. *Constructive Serv. Corp. of Am.* (1965) 46 N.J. 82 [215 A.2d 1], the general trend of the law has been to criticize and to change the traditional common law view of nonmarital relations. The court's reasoning that the nonmarital cohabitation rela-

tionship is similar to the spousal relationship, and is different from other relationships like the parent-child relationship, is both accurate and logical.

We turn next to the argument that the noninjured spouse or partner suffers too indirect or too remote an injury. This same argument was addressed and rejected in the cases which allowed the wife's cause of action for loss of consortium. As the New York Court of Appeals stated in *Millington v. Southeastern Elevator Co., supra,* 293 N.Y.S.2d 305, at page 308: "Disparagingly described as 'sentimental' or 'parasitic' damages, the mental and emotional anguish caused by seeing a healthy, loving companionable mate turned into a shell of a person is real enough. To describe the loss as 'indirect' is only to evade the issue. The loss of companionship, emotional support, love, felicity and sexual relations are real injuries. . . . There may not be a deterioration in the marital relationship, but it will certainly alter it in a tragic way. Even in the case of a husband the 'sentimental' damages may predominate over the loss of support or material element. Thus to describe these damages as merely parasitic is inaccurate and cruel."

The suffering of an unmarried spouse may be no less real. In the instant case, Cindy Forte must care for Paul, who was severely injured. Her claim is for the loss of companionship, emotional support, love, felicity, and sexual relations with this man, with whom she had lived for nearly 12 years, and with whom she has continued to live since the accident. As the California Supreme Court pointed out in rejecting the indirect injury argument in *Rodriguez, supra,* 12 Cal.3d 382, the critical question is foreseeability. The court, citing *Dillon v. Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], emphasized that "The defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous. [Citation.] The foreseeable risk need not be of an actual physical impact, but may be of emotional trauma alone. [Citation.] . . . [¶] Applying these rules to the facts alleged, we were of the opinion in *Dillon* that 'Surely the negligent driver who causes the death of a young child may reasonably expect that the mother will not be far distant and will upon witnessing the accident suffer emotional trauma.' [Citation.] By parity of reasoning, we conclude in the case at bar that one who negligently causes a severely disabling injury to an adult may reasonably expect that the injured person is married and that his or her spouse will be adversely affected by that injury. In our society the likelihood that an injured adult will be a married man or woman is substantial, clearly no less than the likelihood that a small child's mother will personally witness an injury to her offspring. And the probability that the spouse of a severely disabled person will suffer a personal loss by reason of that injury is equally substantial." (*Rodriguez v. Bethlehem Steel Corp., supra,* 12 Cal.3d 382, 399-400, fn. omitted.)

One who negligently causes a disabling injury to an adult may also reasonably expect in our contemporary society that the injured person may be cohabiting with another without benefit of marriage. In *Drew* v. *Drake* (1980) 110 Cal.App.3d 555 [168 Cal.Rptr. 65], the First District Court of Appeal denied recovery for an alleged negligent infliction of emotional distress by a de facto spouse who had witnessed the death of her housemate. Justice Poché dissented, stating: "Foreseeability of the risk is the issue. The formula for resolution given by the California Supreme Court in *Dillon* v. *Legg*" is controlling. The dissent further pointed out that the majority opinion in effect held "that unchurched male/female relationships cannot be close and that the tortfeasor could not foresee that his victim would have a close relationship with a person to whom she was not formally married. [¶] Giving full credit to the rarified air at the appellate level the conclusion reached here today is nevertheless astonishing: my majority colleagues have determined the incidence of cohabitation without benefit of clergy in contemporary California society to be so rare that it can be characterized as 'unexpected and remote.' [¶] I do not believe that this no marriage-no recovery rule is what the California Supreme Court meant when it ordered the courts of this state to carefully analyze on a case-by-case basis what the ordinary person should have foreseen. (*Dillon* v. *Legg, supra.*) [¶] This insistence on adherence to an older morality as the key to the courtroom was discarded shortly after the close of the Spanish Inquisition and is clearly not the law of this state." (*Drew* v. *Drake, supra,* 110 Cal. App.3d 555, 558-559, dis. opn. of Poché, J.; fns. omitted.)

We adhere to the view that the courts must determine on a case-by-case basis what an ordinary person may reasonably foresee. The incidence of cohabitation without marriage in the United States increased by 800 percent between 1960 and 1970. (Comment, *Consortium Rights of the Unmarried: Time for a Reappraisal* (1981) 15 Family L.Q. 223, 224.) The injury to the de facto spouse, like the injury to a legally married spouse, is real, direct, and foreseeable. We believe that, in the conditions of modern society, the possibility that an adult may be cohabiting with another is neither unexpected nor remote; in short, it is reasonably foreseeable.

The arguments that the damages are too speculative, or that there is a danger of double recovery, were also raised and rejected in the cases allowing the wife's cause of action for loss of consortium.

The fact that damages are for emotional rather than strictly economic injury should be no bar to recovery, as the court and jury have always been able to award damages for pain and suffering, and other noneconomic losses. The danger of double recovery may be reduced or eliminated by the expedients of joining both spouses in the action and giving instructions so that the noninjured spouse will recover only for his or her own damages and not include medical

costs or other items awarded in the other spouse's personal injury action. (*Hitaffer* v. *Argonne Co., supra,* 183 F.2d 811, 819; *Montgomery* v. *Stephan, supra,* 359 Mich. 33 [101 N.W.2d 227, 231]; Annot., 36 A.L.R.3d 900.) The arguments of speculativeness of damages or double recovery are no more applicable here than in the wife's cause of action cases.

It is further argued that if the cause of action is not restricted to legally married couples, there will be no limit to liability, and the cause of action would be unduly extended to brothers, sisters, aunts, cousins, coworkers, other friends and relatives. This "floodgates" argument was addressed specifically in *Borer* v. *American Airlines, Inc., supra,* 19 Cal.3d 441. There, the court held that, although the relationship to the injured person must be foreseeable in order to state a claim for loss of consortium, not every foreseeable relationship is covered. An injured person foreseeably has children, parents, brothers, sisters, aunts, uncles, cousins, in-laws, friends, colleagues, and other acquaintances who could foreseeably be affected by the injury. However, the spousal relationship is different in kind from any of these other relationships. If these other relationships were recognized, then the limit of tortfeasor liability would depend on such fortuitous circumstances as the number of children or siblings or other relatives an injured person may have, without regard to the level of culpability. (E.g., Patricia Borer had nine children. Other persons may have two, twelve, or none. This is not a proper basis upon which to determine the level of tortfeasor liability.) If the limits of liability were extended so far, the social costs would be dramatically increased in terms of higher insurance premiums, or in the form of more people running risks without insurance because of the higher premiums. For these reasons of social policy, the *Borer* court declined to extend the cause of action for loss of consortium to the parent-child relationship.

The crux of the *Borer* case is the distinction between a spousal relationship and the other relationships mentioned. However, as we noted earlier, the relationship of unmarried cohabitants possesses every characteristic of the spousal relationship except formalization. The sexual aspects of the relationship, which distinguish the spousal relationship from the parent-child or other relationships mentioned in *Borer,* are present in the relationship of unmarried cohabitants. Thus, if a proper test can be formulated for evaluating unmarried cohabitation relationships, there is no reason why a de facto spouse could not state a claim for loss of consortium without affecting the policy or the result in *Borer.*

The final argument is that public policy favors marriage over unmarried cohabitation relationships as shown by the workers' compensation death benefit statute and the wrongful death statutes. It is argued that those statutes which limit recovery to "heirs" as defined by the Probate Code, and cases applying them, evidence an intent or policy that the right to recover in consortium cases

be limited to validly married spouses. However, the right to recover under the workers' compensation or wrongful death laws is wholly statutory, while the cause of action for loss of consortium is judge-made law. If defendant's argument is taken to its logical conclusion, the cause of action for loss of consortium would be defined by the legislative scheme under the workers' compensation and wrongful death statutes, and would include claims by children, parents, siblings, and others. These claims are plainly not allowed. (*Borer* v. *American Airlines, Inc., supra,* 19 Cal.3d 441; *Suter* v. *Leonard* (1975) 45 Cal.App.3d 744 [120 Cal.Rptr. 110] [the fact that wrongful death statutes authorize an award to a child for death of a parent does not compel the conclusion that the child may similarly recover for negligent injury to a parent].) Since the Legislature has not defined consortium rights by statute, the implication is rather that the statutory definitions employed in the workers' compensation and wrongful death statutes are not applicable to the cause of action for loss of consortium.

It is therefore left to us in common law tradition to construct a standard whereby such relationships may be evaluated so that a remedy be afforded for the redress of wrongs inflicted by tortious conduct.

### 3. *The Standard*

Obviously, cohabitation arrangements may be of many kinds, ranging from a "one-night stand" to and including relationships which have endured as long as or longer than most marriages. To allow all cohabitants to recover would pose severe practical problems in terms of limiting liability.

One standard which may be used to evaluate the cohabitation relationship is that the relationship must be both stable and significant. If the plaintiff can show that the relationship meets both of these criteria, then he or she will have demonstrated the parallel to the marital relationship which will enable the court to find the elements of consortium and the damage to the relational interest.

Evidence of the stability and significance of the relationship could be demonstrated by the duration of the relationship; whether the parties have a mutual contract; the degree of economic cooperation and entanglement; exclusivity of sexual relations; whether there is a "family" relationship with children. While the particular items of evidence will vary from case to case, and some of these suggested criteria may be absent, and other different ones present, the plaintiff will bear the burden of demonstrating both that the relationship is stable and that it has those characteristics of significance which one may expect to find in what is essentially a de facto marriage.

In the case before us, however, we need not determine the effect of such evidence since we are concerned only with the denial of a summary judgment motion. "It is now well established in California that a party moving for summary judgment must establish that the opposing party's action or any portion thereof is without merit. (*Kelleher* v. *Empresa Hondurena De Vapores S.A.* (1976) 57 Cal.App.3d 52 [129 Cal.Rptr. 32].) [¶] It is further clear that if the moving party fails to sustain its burden that the claims are made entirely without merit on any legal theory, the adverse party is not required to demonstrate the validity of the claims by the filing of counterdeclarations or affidavits. In *Frazier, Dame, Doherty, Parrish & Hanawalt* v. *Boccardo, Blum, Lull, Niland, Teerlink & Bell* (1977) 70 Cal.App.3d 331, at page 339 [138 Cal.Rptr. 670], the court stated: 'When the moving party is the defendant the latter must conclusively negate a necessary element of the plaintiff's case and demonstrate that under no hypothesis is there a material factual issue which requires the process of a trial.'" (*Draper Mortuary* v. *Superior Court* (1982) 135 Cal.App.3d 533, 535-536 [185 Cal.Rptr. 396].) Petitioner has failed to carry its burden in light of the facts stated in depositions filed in opposition to the motion, and we hold that an unmarried cohabitant may state a cause of action for loss of consortium by showing that the nonmarital relationship is both stable and significant.

The petition for writ of mandate is denied, to permit the cause of action to go forward on the merits. The alternative writ is discharged.

Morris, P. J., and McDaniel, J., concurred.