[No. B005211. Second Dist., Div. Six. Feb. 8, 1985.]

JENNIFER LEDGER, Plaintiff and Appellant, v.
RONALD WILLIAM TIPPITT, Defendant and Respondent.

626

---

## COUNSEL

Dale G. Givner for Plaintiff and Appellant.

Henry J. Walsh, Jeffrey Bruce Held and Lawler & Ellis for Defendant and Respondent.

---

## OPINION

McMAHON, J.*—The first cause of action for wrongful death was brought on behalf of Richard Arters III, the son of Richard Arters II. The second and third causes of action for loss of consortium and negligent infliction of mental distress, were brought by Jennifer Ledger, who enjoyed a "stable and significant" nonmarital relationship with Richard Arters II, the decedent. The demurrer to the second and third causes of action were sustained without leave to amend, and Jennifer Ledger appeals from the judgment of dismissal.

### ISSUES PRESENTED

 The appellant lived with the decedent for approximately two years and bore his child. Their plans to marry were twice frustrated due to circumstances beyond their control. Appellant witnessed her lover being stabbed, and he died in her arms. Does she have a cause of action for loss of consortium? Does she have a cause of action for negligent infliction of emotional distress?

### FACTS

Jennifer Ledger and Richard Arters II began cohabitating together in 1981, when Jennifer was 15½ years old and Richard was 19. They initially planned to be married on December 6, 1981, but, just prior to their wedding date, Richard was involved in a motorcycle accident. Jennifer nursed him back to health, and they then decided to go to Nevada to be married. Although Jennifer did obtain written authorization from her parents to be mar-

---

*Assigned by the Chairperson of the Judicial Council.

ried to Richard, she only obtained a copy of her birth certificate, which allegedly was deemed insufficient under Nevada law. Frustrated again, they returned to California. Jennifer bore Richard's child, Richard Arters III, and they lived together as a family. Richard provided the sole support for Jennifer and their son.

On March 15, 1983, Richard Arters II, accompanied by his business partner, Jennifer and Richard Arters III, their infant son, were traveling to Ojai to submit an estimate on a landscaping project. Suddenly, a vehicle driven by respondent, Ronald W. Tippitt, encroached on Richard's lane causing Richard to take sudden evasive action to avoid a collision. The two vehicles ultimately came to a stop. Both drivers alighted and a verbal altercation ensued between Richard and respondent Tippitt.

Jennifer remained seated a few feet away in Richard's vehicle caring for their child, but where she could witness the events. Suddenly, and without warning, respondent Tippitt exhibited a knife and stabbed Richard in the chest. When Richard fell to the ground, Jennifer rushed to his aid. She kneeled by Richard, took him in her arms, and helplessly watched and cried as Richard, bleeding profusely, became comatose and slowly died, 20 minutes later.

DISCUSSION

Observing that the incidence of cohabitation without marriage in the United States increased by 800 percent between 1960 and 1970 (*Butcher* v. *Superior Court* (1983) 139 Cal.App.3d 58, 68 [188 Cal.Rptr. 503], citing comment, *Consortium Rights of the Unmarried: Time for a Reappraisal* (1981) 15 Family L.Q. 223, 224), and that the number of unmarried couples then tripled between 1970 and 1980—rising from 523,000 to 1,560,000 (*In re Cummings* (1982) 30 Cal.3d 870, 876, fn. 1 [180 Cal.Rptr. 826, 640 P.2d 1101, 29 A.L.R.4th 1207], (dis. opn.), appellant urges us to allow her to recover for loss of consortium and negligent infliction of emotional distress.

Because these two issues appear to be intertwined with the rules relating to intentional infliction of emotional distress, and the statutory cause of action for wrongful death, we will compare each of these causes of action for guidance.

### 1. *Wrongful Death*

In an action for wrongful death, it is proper to instruct that a husband could recover reasonable compensation for loss of his wife's love, compan-

ionship, comfort, affection, society, solace or moral support, loss of enjoyment of sexual relations, or any loss of her physical assistance in the operation or maintenance of the home. Economic losses such as the lost earning capacity may also be recovered. (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 67-70 [137 Cal.Rptr. 863, 562 P.2d 1022]; *Canavin* v. *Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512, 527 [196 Cal.Rptr. 82].) ■ Conversely, a wrongful death action must be contrasted with an action for negligent infliction of mental distress. Thus, in a wrongful death action, damages for mental and emotional distress, including grief and sorrow, may not be recovered. (*Krouse* v. *Graham, supra,* 19 Cal.3d at p. 72; *Canavin* v. *Pacific Southwest Airlines, supra,* 148 Cal.App.3d at pp. 519-520.)

■ Wrongful death actions under California law are purely statutory. "Because it is a creature of statute, the cause of action for wrongful death 'exists only so far and in favor of such person as the legislative power may declare.' . . ." (*Justus* v. *Atchison* (1977) 19 Cal.3d 564, 575 [139 Cal.Rptr. 97, 565 P.2d 122], quoting *Pritchard* v. *Whitney Estate Co.* (1913) 164 Cal. 564, 568 [129 P. 989]; see also *Garcia* v. *Douglas Aircraft Co.* (1982) 133 Cal.App.3d 890, 893 [184 Cal.Rptr. 390]; *Steed* v. *Imperial Airlines* (1974) 12 Cal.3d 115, 119-121 [115 Cal.Rptr. 329, 524 P.2d 801, 68 A.L.R.3d 1204].)

■ While California will recognize common law marriages validly created in states which allow such marriages (Civ. Code, § 4104; *Colbert* v. *Colbert* (1946) 28 Cal.2d 276, 280 [169 P.2d 633]; *Etienne* v. *DKM Enterprises, Inc.* (1982) 136 Cal.App.3d 487, 490 [186 Cal.Rptr. 321]), California law does not accept the doctrine of common law marriages between its own domiciliaries. (*Norman* v. *Thomson* (1898) 121 Cal. 620, 628 [54 P. 143]; *Estate of Abate* (1958) 166 Cal.App.2d 282, 292 [333 P.2d 200]; *Estate of Edgett* (1980) 111 Cal.App.3d 230, 232 [168 Cal.Rptr. 686].) ■ As meretricious spouses are simply not recognized as "heirs" under section 377 of the Code of Civil Procedure, our wrongful death statute, they are not within the class of persons who may bring a wrongful death action. (*Nieto* v. *City of Los Angeles* (1982) 138 Cal.App.3d 464 [188 Cal.Rptr. 31]; *Garcia* v. *Douglas Aircraft Co., supra,* 133 Cal.App.3d 890, 893; *Harrod* v. *Pacific Southwest Airlines* (1981) 118 Cal.App.3d 155 [173 Cal.Rptr. 68].)

■ The Legislature has allowed "putative spouses" to bring an action for wrongful death. Section 377, subdivision (b)(2) of the Code of Civil Procedure defines "putative spouse" as ". . . the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid . . . ." Under this statute,

it has been held that the essence of a putative spouse is a good faith belief in the existence of a valid marriage, even if the marriage is not solemnized. (*Wagner* v. *County of Imperial* (1983) 145 Cal.App.3d 980, 982-983 [193 Cal.Rptr. 820]; see *Kunakoff* v. *Woods* (1958) 166 Cal.App.2d 59, 61-62 [332 P.2d 773] (although the minister failed to file a record of the marriage, the wife lived with her husband for 30 years believing they were married).)

In this case, appellant does not contend that she is a putative spouse within the meaning of the wrongful death statute.

### 2. *Loss of Consortium*

■ The concept of consortium includes not only loss of support or services; it also embraces such elements as love, companionship, comfort, affection, society, sexual relations, the moral support each spouse gives the other through the triumph and despair of life, and the deprivation of a spouse's physical assistance in operating and maintaining the family home. (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 405, 409, fn. 31 [115 Cal.Rptr. 765, 525 P.2d 669]; *Carlson* v. *Wald* (1984) 151 Cal.App.3d 598, 602 [199 Cal.Rptr. 10].)

■ The loss of consortium does not require severe physical injury to the nonplaintiff spouse; certain psychological injuries can be no less severe and debilitating than physical injuries. (*Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 933 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518].) ■ Likewise, because the cause of action is for "loss or impairment" of the right to consortium (*Rodriguez* v. *Bethlehem Steel Corp.*, *supra*, 12 Cal.3d 382, 409), a diminution of a spouse's rights to consortium is compensable. (*Carson* v. *Wald, supra*, 151 Cal.App.3d 598, 602.)

■ In California, a cause of action for loss of consortium exists in favor of a married spouse (*Rodriguez* v. *Bethlehem Steel Corp., supra*, 12 Cal.3d 382, 402-406) and in favor of a common law marriage partner, if the claimant establishes that the common law marriage was validly created in a state which recognizes common law marriage. (*Etienne* v. *DKM Enterprises, Inc., supra*, 136 Cal.App.3d 487 (by implication).) ■ However, a child does not have a cause of action for loss of parental consortium (*Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858]) and a parent has no cause of action for loss of a child's consortium. (*Baxter* v. *Superior Court* (1977) 19 Cal.3d 461 [138 Cal.Rptr. 315,

563 P.2d 871].) Should a cause of action for loss of consortium exist where the claimant is not a spouse or a putative spouse?[1]

*Tong* v. *Jocson* (1977) 76 Cal.App.3d 603 [142 Cal.Rptr. 726] involved a situation where plaintiff and Gale became engaged in September 1973 and commenced living together on November 11, 1973. On February 20, 1974, they were involved in an automobile accident but they married on March 9, 1974. The court held that no cause of action for loss of consortium existed because they were not married at the time of the accident. The court reasoned that judicial recognition of a cause of action for loss of consortium must be "narrowly circumscribed," citing *Borer* v. *American Airlines Inc.*, *supra*, 19 Cal.3d 441, 444.

In *Lieding* v. *Commercial Diving Center* (1983) 143 Cal.App.3d 72 [191 Cal.Rptr. 559], Scott asked the plaintiff to marry him on March 9, 1980, and they selected May 31, 1980 as the tentative wedding date. Due to his injury on April 14, 1980, the wedding date was postponed until August 2, 1980. The court, citing out of state cases, held that any cause of action accrued when the tort was committed, and since plaintiff had no marital right at that time, the right could not be created by a belated marriage.

Indeed, with but two exceptions, every case in the United States has held that no cause of action exists in favor of plaintiff cohabitating with another at the time of the tort even if they later marry. (*Weaver* v. *G.D. Searle & Co.* (N.D.Ala. 1983) 558 F.Supp. 720; *Angelet* v. *Shivar* (Ky.App. 1980) 602 S.W.2d 185; *Tremblay* v. *Carter* (Fla.App. 1980) 390 So.2d 816; *Sostock* v. *Reiss* (1980) 92 Ill.App.3d 200 [415 N.E.2d 1094]; *Gillespie-Linton* v. *Miles* (1984) 58 Md.App. 484 [473 A.2d 947]; *Chiesa* v. *Rowe* (W.D.Mich. 1980) 486 F.Supp. 236; *Childers* v. *Shannon* (1982) 183 N.J.Super. 591 [444 A.2d 1141]; *Leonardis* v. *Morton Chemical Co.* (1982) 184 N.J.Super. 10 [445 A.2d 45]; *Haas* v. *Lewis* (1982) 8 Ohio App.3d 136 [456 N.E.2d 512]; *Felch* v. *Air Florida, Inc.* (D.D.C. 1983) 562 F.Supp. 383 (applying Virginia law).)

---

[1]We acknowledge that under a statute providing that "no person is a dependent of any deceased employee unless in good faith a member of the family or household of the employee," it was held that a party to a meretricious relationship may qualify for benefits. (*Department of Industrial Relations* v. *Workers' Comp. Appeals Bd. (Tessler)* (1979) 94 Cal.App.3d 72, 75-78 [156 Cal.Rptr. 183], disapproved on other grounds in *Atlantic Richfield Co.* v. *Workers' Comp. Appeals Bd.* (1982) 31 Cal.3d 715, 727 [182 Cal.Rptr. 778, 644 P.2d 1257].) Likewise, a statute prohibiting discrimination in housing on the basis of marital status will be interpreted to protect unmarried persons. (*Hess* v. *Fair Employment & Housing Commission* (1982) 138 Cal.App.3d 232 [187 Cal.Rptr. 712, 33 A.L.R.4th 1058]; also see *Atkisson* v. *Kern County Housing Authority* (1976) 59 Cal.App.3d 89 [130 Cal.Rptr. 375].) However, we are not dealing with these statutes, but instead are attempting to define the outer boundaries of the law of torts.

Recovery will be denied where the parties did not know one another until after the accident (*Wagner* v. *International Harvester Co.* (D.Minn. 1978) 455 F.Supp. 168), or where the parties announced their wedding date and the accident occurred when they are driving to pick up their wedding invitations (*Sawyer* v. *Bailey* (Me. 1980) 413 A.2d 165 [5 A.L.R.4th 292], where the bridegroom was injured on the morning of the day he was to be married, and the ceremony occurred in the hospital the following day (*Miller* v. *Davis* (1980) 107 Misc.2d 343 [433 N.Y.S.2d 974], where the parties have two children (*Laws* v. *Griep* (Iowa 1983) 332 N.W.2d 339), or where the husband never obtained a divorce, but lived with another woman for fifteen years raising their three children (*Curry* v. *Caterpillar Tractor Co.* (E.D.Pa. 1984) 577 F.Supp. 991).

The only California case[2] which expresses a contrary view is *Butcher* v. *Superior Court* (1983) 139 Cal.App.3d 58 [188 Cal.Rptr. 503]; where the court allowed a woman to state a cause of action for loss of consortium. The parties lived together for 11½ years, had 2 children, filed joint income tax returns and referred to each other as husband and wife.

The *Butcher* court was unpersuaded by the suggestion by the Supreme Court in *Rodriguez* v. *Bethlehem Steel Corp., supra,* 12 Cal.3d 382, 402-404, and *Borer* v. *American Airlines Inc., supra,* 19 Cal.3d 441, 444, that the cause of action for loss of consortium should be narrowly circumscribed, or that the definition of spouses should be limited to those eligible under the wrongful death statute. Instead, the court found that the same rights should be accorded to nonmarital partners who enjoyed a "stable and significant relationship." Although the court excluded "one night stands" from the foregoing definition, it suggested that: "Evidence of the stability and significance of the relationship could be demonstrated by the duration of the relationship; whether the parties have a mutual contract; the degree of economic cooperation and entanglement; exclusivity of sexual relations; whether there is a 'family' relationship with children . . . [and] those characteristics of significance which one may expect to find in what is essentially a de facto marriage." (*Butcher* v. *Superior Court, supra,* 139 Cal.App.3d at p. 70.)

In *Grant* v. *Avis Rent-A-Car System* (1984) 158 Cal.App.3d 813 [204 Cal.Rptr. 869], Justice Lillie acknowledged that *Butcher* sat in splendid isolation and that the weight of authority was to the contrary. Nevertheless,

---

[2] The *Butcher* court cited *Bulloch* v. *United States* (D.N.J. 1980) 487 F.Supp 1078, where a cause of action for loss of consortium was granted to a former wife, who had been married to the injured party for 20 years, and agreed to reconcile shortly after the divorce was final and before the accident. As the *Butcher* court acknowledges, *Bulloch* is open to criticism for failing to predict the direction of New Jersey law. (139 Cal.App.3d at p. 66.)

the court concluded that the male claimant had not demonstrated the existence of a "significant" relationship, since he was married to a third party when he moved in with his new love, and commenced living together only one month and two days before the injury to his friend occurred.

We decline to follow *Butcher* for several reasons. First, we note that in *Norman* v. *Unemployment Ins. Appeals Bd.* (1983) 34 Cal.3d 1, 9 [192 Cal.Rptr. 134, 663 P.2d 904], our Supreme Court said: "We reaffirm our recognition of a strong public policy favoring marriage [citation]. No similar policy favors the maintenance of nonmarital relationships." (Accord *Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 683-684 [134 Cal.Rptr. 815, 557 P.2d 106].) Virtually all the reported cases stress this difference.[3] Second, we are troubled by the idea that a friend of an injured party can somehow marry into a cause of action, despite his or her promise to take her spouse for "better or worse." (*Tremblay* v. *Carter, supra,* 390 So.2d 816, 817; *Navarre* v. *Wisconsin Barge Line, Inc.,* (S.D.Ill. 1980) 502 F.Supp. 360, 361; *Sawyer* v. *Bailey, supra,* 413 A.2d 165, 167; *Gillespie-Linton* v. *Miles, supra,* 473 A.2d 947, 954; *Chiesa* v. *Rowe, supra,* 486 F.Supp. 236, 238; *Sostock* v. *Reiss, supra,* 415 N.E.2d 1094, 1099.)

Third, although the right of privacy in sexual matters is not limited to the marital relationship (*Eisenstadt* v. *Baird* (1972) 405 U.S. 438, 453 [31 L.Ed.2d 349, 362, 92 S.Ct. 1029]), the *Butcher* court would apparently require the unmarried claimant to prove ". . . exclusivity of sexual relations . . ." for the duration of the relationship. (*Butcher* v. *Superior Court, supra,* 139 Cal.App.3d 58, 70; Evid. Code, § 550.) We believe that this is completely at odds with the rule that inquiries about the most intimate aspects of a person's life invade the right to privacy secured by article I, section 1, of the California Constitution and that accordingly, answers about a party's sexual relations may not be required absent a compelling state interest requiring such a response. (*Fults* v. *Superior Court* (1979) 88 Cal.App.3d 899, 904 [152 Cal.Rptr. 210].)[4]

---

[3]Note also that in the context of liability insurance policies, a "spouse" is limited to a husband or wife. Attempts to include less formalized relationships within that definition have not been successful. (*Menchaca* v. *Farmers Ins. Exchange* (1976) 59 Cal.App.3d 117, 126-128 [130 Cal.Rptr. 607]; *Harleysville Mutual Ins. Co.* v. *Carroll* (1956) 50 Del. 67 [123 A.2d 128, 131]; *Sypien* v. *State Farm Mut. Ins. Co.* (1982) 111 Ill.App.3d 19 [443 N.E.2d 706, 708-709, 36 A.L.R.4th 580]; *Lopez* v. *Santiago* (1973) 125 N.J.Super. 268 [310 A.2d 500].)

[4]Consistent with this strong public policy, where the defendant is prosecuted for various types of sexual assault, evidence of the victim's sexual conduct with others is excluded except in an extraordinary case. (Evid. Code, § 1103, subdivision (b); cf., *People* v. *Varona* (1983) 143 Cal.App.3d 566 [192 Cal.Rptr. 44] [where victim was a prostitute]; and *People* v. *Keith* (1981) 118 Cal.App.3d 973 [173 Cal.Rptr. 704] [where it was alleged that the complaining witness engaged in group sex with various defendants and others].)

Although the majority of one court did require a former husband who brought a wrongful death action, and who had admitted to extramarital affairs, to disclose when these liaisons occurred within the past two years (without disclosing the names of those he dated) (*Morales* v. *Superior Court* (1979) 99 Cal.App.3d 283, 290-292 [160 Cal.Rptr. 194]), we are hardly satisfied with a rule which would require all nonmarital partners to relinquish their constitutional right of privacy as a condition of seeking damages for loss of consortium, and are unable to perceive any public policy which would be served by returning to the dark days before the No Fault Family Law Act of 1970, when adultery was proved by circumstantial evidence. (2 The Cal. Family Lawyer (Cont.Ed.Bar 1963) § 28.12, pp. 1317-1321.)

The fourth reason is the most significant—the *Butcher* court's own definition invites mischief and inconsistent results. "[H]ow long an engagement will support a claim? One month? One week? 'Going steady?' or is cohabitation to be the test . . . Again: For how long?" (*Childers* v. *Shannon, supra,* 444 A.2d 1141, 1143; see also *Weaver* v. *G.D. Searle & Co., supra,* 558 F.Supp. 720, 723.)

Of course, where private parties may be interested intensely in a civil dispute over money damages, application of a "fair preponderance of the evidence" standard indicates society's "minimal concern with the outcome," and a conclusion that the litigants should "share the risk of error in roughly equal fashion." (*Santosky* v. *Kramer* (1982) 455 U.S. 745, 755 [71 L.Ed.2d 599, 607, 102 S.Ct. 1388], quoting from *Addington* v. *Texas* (1979) 441 U.S. 418, 423 [60 L.Ed.2d 323, 329, 99 S.Ct. 1804]; see Evid. Code, § 115.)

Yet consider the definition of "significant": "Having or expressing a meaning; meaningful; notable; valuable." (The American Heritage Dict. (1982) p. 1139.) "Stable" is defined to mean "resistant to sudden change of position or condition; maintaining equilibrium; self restoring," as well as "immutable and permanent; enduring." (The American Heritage Dict. (1982) p. 1186.)

Under these confusing definitions, one juror might be satisfied with a "meaningful" relationship. A second juror may be impressed with plaintiff's claim that she had fallen head-over-heels in love, despite the fact that she never cohabitated with the injured party. A third juror condemns all forms of premarital sex while a fourth juror believes that a "stable" relationship only exists if the couple has children. A fifth juror might require the couple to cohabit for a decade although a sixth juror, repeatedly married and divorced, might be enchanted by a relationship which existed for a whole year. The seventh juror will insist that the lovers announced their

wedding date prior to the injury but the eighth juror will be entirely satisfied if the couple married after the injury. And, of course, the ninth juror who previously lived in Texas will soon ask our perplexed friend on the trial court bench for a definition of a common law marriage.

In short, under this vague standard, courts and jurors alike must necessarily "guess at its meaning and differ as to its application." (*Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].) It reminds us of a statute prohibiting acts injurious to public morals, etc., which of course would include almost any act which a judge and jury might find at the moment contrary to their notions of what was good for morals, justice or order (*Musser* v. *Utah* (1948) 333 U.S. 95, 97 [92 L.Ed. 562, 565, 68 S.Ct. 397]) or a statute which prohibited unjust and unreasonable charges, which would allow sanctions if the charges were unjust and unreasonable in the estimation of the court or jury (*United States* v. *L. Cohen Grocery Co.* (1921) 255 U.S. 81, 89 [65 L.Ed. 516, 520-521, 41 S.Ct. 298, 14 A.L.R. 1045]; see also *Ricks* v. *District of Columbia* (D.C.Cir. 1968) 414 F.2d 1097, 1106-1107) ("leading an immoral or profligate life") *People* v. *Superior Court (Engert)* (1982) 31 Cal.3d 797, 801-803 [183 Cal.Rptr. 800, 647 P.2d 76] ("especially heinous, atrocious or cruel manifesting exceptional depravity").

Indeed, under this standard, the jury would not merely assess whether the plaintiff suffered a loss of consortium and the amount of damages; on the contrary, the jury would also be determining whether the claimant has a cause of action at all. While the jury would be cautioned to not be influenced by "sympathy, prejudice or passion" (BAJI No. 1.00), the only way that plaintiff could prevail is if at least nine jurors reached a consensus that plaintiff was entitled to a sympathetic verdict, even if he or she was "living in sin."

We should also acknowledge that ". . . in case of death resulting to the impaired spouse, the deprived spouse may recover . . . only for harm to his or her interests and expense incurred between the injury and death.[5] For any loss sustained as a result of the death of the impaired spouse, the other spouse must recover, if at all, under a wrongful death statute." (Rest.2d Torts, § 693, com. f.; 41 C.J.S., Husband & Wife, § 401(5),

---

[5]Accord *Graham* v. *Central of Georgia Ry. Co.* (1928) 217 Ala. 658 [117 So. 286, 288]; *Warrick Hospital Inc.* v. *Wallace* (Ind.App. 1982) 435 N.E.2d 263 (right of consortium existed between date of malpractice and date of death 12 days later) *Louisville & N. Ry. Co.* v. *McElwain* (1896) 98 Ky. 700 [34 S.W. 236]; *Sawyer* v. *Bailey, supra,* 413 A.2d 165, 167 (dictum) *Bailey* v. *Long* (1916) 172 N.C. 661 [90 S.E. 809]; *Dewitt* v. *B & C Machine Co.* (1971) 25 Ohio St.2d 40 [54 Ohio Ops.2d 169, 266 N.E.2d 563, 564]; *Fowlie* v. *First Minneapolis Trust Co.* (1931) 184 Minn. 82 [237 N.W. 846, 78 A.L.R. 589].

p. 899, see generally, *Lamont* v. *Wolfe* (1983) 142 Cal.App.3d 375, 381-382 [190 Cal.Rptr. 874].)

■ Where the injured party lives a few hours after the injury, the spouse may recover for loss of consortium. (*Walden* v. *Coleman* (1962) 105 Ga.App. 242 [124 S.E.2d 313, 314] (two hours); *Lane* v. *Steiniger* (1916) 174 Iowa 317 [156 N.W. 375] (in excess of five hours); *Minkley* v. *Mac-Farland* (1976) 371 Mass. 891 [356 N.E.2d 1391] (a few hours); *Archie* v. *Hampton* (1972) 112 N.H. 13 [287 A.2d 622, 625] (the victim died later that day).)

On the other hand, there will be no recovery for loss of consortium where the spouse dies instantaneously. (*Benson* v. *Lynch* (D.Del. 1976) 416 F.Supp. 47, 49; *Womack* v. *Central Railroad & Banking Co.* (1888) 80 Ga. 132 [5 S.E. 63, 64]; *Brooks* v. *Burkeen* (Ky. 1977) 549 S.W.2d 91, 92; *Druley* v. *Houdesheldt* (1956) 75 Wyo. 155 [294 P.2d 351, 354].) The same rule applies when a spouse is electrocuted and death occurs within seconds (*Harp* v. *Montgomery Ward & Co.* (D.Ore. 1963) 223 F.Supp. 780, 781), where the spouse died in a few minutes (*Lampe* v. *Lagomarcino Grupe Co.* (1959) 251 Iowa 204 [100 N.W.2d 1, 3-4]; where no appreciable time elapsed between the negligent act and death of the spouse (*Rogers* v. *Fancy Farm Telephone Co.* (1914) 160 Ky. 841 [170 S.W. 178], or where the spouse was drunk and drowned within a few hours after the violation of the Dramshop Law, and no loss of support, maintenance-society could have resulted during this brief interval. (*Burk* v. *Anderson* (1952) 232 Ind. 77 [109 N.E.2d 407, 408-409].)

■ To summarize, although we obviously recognize that appellant lost the companionship of a loved one, we are not willing to countenance a rule of law suggested by the *Butcher* court which has no bright lines, and which would only leave juries confused, but which would also produce inconsistent results. While it would be anomalous to deny a cause of action for loss of consortium to a putative spouse who is otherwise eligible to seek damages for wrongful death (Code Civ. Proc., § 377, subd. (b)(2)), virtually all of the reported cases limit the cause of action to spouses.

At oral argument, appellant urged us to blaze a new trial, and to allow recovery to partners who live in a "familial relationship" with their child. (See *MacGregor* v. *Unemployment Ins. Appeals Board* (1984) 37 Cal.3d 205, 212 [207 Cal.Rptr. 823, 689 P.2d 453].) Although such a more clearly defined class of suitors would eliminate many of the objections voiced concerning the *Butcher* rule (and would only be inconsistent with a couple of out-of-state decisions), we find two compelling reasons for declining appellant's invitation. First, as we previously noted, appellant has no right to file

an action for wrongful death. A jury would have difficulty quantifying her loss of consortium during this brief 20-minute interval. Second, it appears that in essence her damages are based upon grief and emotional distress, elements which are not allowed in actions for loss of consortium (*Carlson v. Wald, supra,* 151 Cal.App.3d at p. 602) or, wrongful death (*Krouse v. Graham, supra,* 19 Cal.3d at p. 72).

### 3. *Intentional Infliction of Emotional Distress*

We will briefly discuss this type of tort action because the class of persons eligible to recover is quite broad. Section 46 of the Restatement Second of Torts provides:

"1. One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

"2. Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

"(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

"(b) to any other person who is present at the time, if such distress results in bodily harm."

Comment *l* to section 46 of the Restatement Second of Torts discusses the problem of conduct directed at a third person: "Where the extreme and outrageous conduct is directed at a third person, as where, for example, a husband is murdered in the presence of his wife, for example, the actor may know that it is substantially certain, or at least highly probable, that it will cause severe emotional distress to the plaintiff. . . ."

"There is the further question of whether the recovery should be limited to the near relatives of the person attacked, or at least to close associates, where there is some additional guarantee that the mental disturbance is real and extreme. Nearly all of the cases allowing recovery have involved members of the immediate family; but there were at least two early cases which did not. It may be suggested that when a complete stranger is asked for a match on the street and the individual who asks for it is suddenly shot down before the stranger's eyes, the mental shock may be very genuine and severe, and that a pregnant bystander who witnesses a bloody beating may suffer a real injury deserving compensation. The language of the cases them-

selves does not suggest any such arbitrary limitation, and it does not appear to be called for." (Prosser & Keeton on Torts (5th ed. 1984) p. 66.)

Indeed, illustration 21 to section 46 of the Restatement Second of Torts provides: "21. In the presence of A, a bystander, B quarrels violently with C, draws a pistol, and threatens to kill C. B knows that A is pregnant, and that it is highly probable that his conduct will cause severe emotional distress to A. A suffers severe emotional distress, which results in a miscarriage. B is subject to liability to A."

 It is important to note that the victim must be a percipient witness and the actor must know that the victim is present. "The cases thus far decided, however, have limited such liability to plaintiffs who were present at the time, as distinguished from those who discover later what has occurred. The limitation may be justified by the practical necessity of drawing the line somewhere, since the number of persons who may suffer emotional distress at the news of an assassination of the President is virtually unlimited . . . ." (Rest.2d Torts, § 46, com. *l*.)

Thus, in *Taylor* v. *Vallelunga* (1959) 171 Cal.App.2d 107 [339 P.2d 910], the daughter claimed damages for witnessing a beating administered to her father. The court said: "The failure of the second count of the complaint . . . to meet the requirements of section 46 of the Restatement of Torts is at once apparent. There is no allegation that defendants knew that appellant was present and witnessed the beating that was administered to her father; nor is there any allegation that the beating was administered for the purpose of causing her to suffer emotional distress, or, in the alternative, that defendants knew that severe emotional distress was substantially certain to be produced by their conduct." (*Id.*, p. 109.)[6] See also *Reed* v. *Ford* (1908) 129 Ky. 471 [112 S.W. 600] (where although plaintiff claimed to have suffered distress when she heard defendant assault another person in the

---

[6]In *Delia S.* v. *Torres* (1982) 134 Cal.App.3d 471, 484 [184 Cal.Rptr. 787], the court said: "One may reasonably infer that the violation and rape of one's wife, particularly by a friend, would have . . . profound and extreme emotional consequences. . . ." In *Vescovo* v. *New Way Enterprises Ltd.* (1976) 60 Cal.App.3d 582, 585, 588 [130 Cal.Rptr. 86], the Los Angeles Free Press published a classified advertisement, giving plaintiff's address: "Hot lips—Deep Throat, Sexy young bored housewife, Norma . . . ." One hundred persons entered her property using lewd, abusive and threatening language. As to her 14-year-old daughter's cause of action for intentional infliction of emotional distress, the allegation that the advertisement was published with the intent to injure, disgrace, and cause great mental distress to the daughter was deemed sufficient.

boarding house, there was no allegation that defendant ever saw her or knew that she was present); see also illustration 21 to Restatement Second of Torts, section 46.)[7]

■ Note too, that this tort calls for intentional, or at least reckless conduct intended to inflict injury or engaged in with the realization that injury will result. Thus, where police officers had a laundromat under surveillance for the purpose of apprehending a felon who had stabbed women on previous occasions, but the officers failed to apprehend a man resembling the attacker, and the plaintiff was stabbed, there was no affirmative misconduct justifying liability. (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 210 [185 Cal.Rptr. 252, 649 P.2d 894].)

■ Obviously, conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized society. (*Davidson* v. *City of Westminister, supra,* 32 Cal.3d 197, 209.) Hence, a daughter who became embarrassed when she watched one of her parents involved in a fight with a third person could not recover. (*Star* v. *Rabello* (1981) 97 Nev. 124 [625 P.2d 90]; see also *McGee* v. *Vanover* (1912) 148 Ky. 737 [147 S.W. 742] (fight outside church).)

Yet recovery is allowed when a relative is killed or threatened with death in plaintiff's presence. (See, e.g., *Jeppsen* v. *Jensen* (1916) 47 Utah 536 [155 P. 429] (defendant entered a room where plaintiff, her children, and her husband were located, cursed and abused her husband, pointed a gun at him, and threatened to kill him); *Knierim* v. *Izzo* (1961) 22 Ill.2d 73 [174 N.E.2d 157, 165] (threat to murder plaintiff's husband, and fulfillment of that threat caused severe emotional distress); (*Mahnke* v. *Moore* (1951) 197 Md. 61 [77 A.2d 923] (in the child's presence, her father killed and dismembered his wife, and kept the child with the dead body for a week, until he elected to commit suicide with a shotgun, again in her presence).)

However, cases have also allowed recovery where the witness was *not* related to the actual victim. (See, e.g., *Hill* v. *Kimball* (1890) 76 Tex. 210 [13 S.W. 59] (landlord came to his tenant's yard and assaulted two blacks in a violent manner drawing blood in the presence of the tenant's wife, knowing that any undue excitement would cause injury to her health. She

---

[7]In *Kiseskey* v. *Carpenters' Trust for So. California* (1983) 144 Cal.App.3d 222, 229, 233 [192 Cal.Rptr. 492], defendant telephoned plaintiff saying: " 'You are a no good son of a bitch and if you don't resign the agreement and get in set with the union, you'll be put in the hospital.' . . ." Later, defendant again telephoned, saying: " 'Since you do not seem to be concerned about your safety and well-being, maybe you will be concerned about the well-being of your wife and children.' " Plaintiff had a cause of action for intentional infliction of emotional distress. Note, however, that his wife, who apparently did not hear the threats, still could claim loss of consortium which accrued when her husband suffered severe emotional distress.

was pregnant and suffered a miscarriage.); *Rogers* v. *Williard* (1920) 144 Ark. 587 [223 S.W. 15, 11 A.L.R. 1115] (the owner of an adjacent farm trespassed upon a farm and wilfully and wantonly engaged in a quarrel with one Edwin McDole, challenged him to fight, flourished a pistol, and threatened to shoot McDole. Edna Rogers was present, she fainted and suffered a miscarriage.).)[8]

### 4. *Negligent Infliction of Mental Distress*

In *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], our Supreme Court held that a mother who suffered emotional trauma from witnessing the infliction of death or injury to her child has a valid claim for damages, reasoning that "obviously defendant is more likely to foresee that a mother who observes an accident involving her child will suffer harm than to foretell that a stranger witness will do so." (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 741.) ██ The court suggested three guidelines: "(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (*Id.,* pp. 740-741.)

*Hedlund* v. *Superior Court* (1983) 34 Cal.3d 695 [194 Cal.Rptr. 805, 669 P.2d 41] involved the question whether a psychotherapist was liable for injuries when he failed to warn a potential victim of a threat made to the victim by the therapist's patient. There, both plaintiff and the assailant had been patients, and the psychotherapist failed to warn the plaintiff of these threats. The assailant used a shotgun to inflict serious bodily injury upon the plaintiff. Her two-year-old son was seated next to his mother when she was shot, and she threw herself over him thereby saving his life. Although the court did not decide whether a duty existed as to all "bystanders" (*id.,* p. 705) the court reasoned that if it was foreseeable that a mother would sustain emotional injury witnessing an injury to her child, ". . . [i]t is equal-

---

[8]While these intrusions could also be characterized as a trespass (see, e.g., *Razzo* v. *Varni* (1889) 81 Cal. 289, 294; *Baker* v. *Shymkiv* (1983) 6 Ohio St.3d 151 [451 N.E.2d 811, 814]), one boundary dispute case, involving a heated exchange and a removal of a fence in plaintiff's presence, was treated as an action for intentional infliction of mental distress (*Daluiso* v. *Boone* (1969) 71 Cal.2d 484, 488 [78 Cal.Rptr. 707, 455 P.2d 811]). But compare *Wiehe* v. *Kukal* (1979) 225 Kan. 478 [592 P.2d 860] where, during a boundary line dispute, defendant waived a pitchfork at plaintiff's husband, and shouted obscenities, but no threat was made towards plaintiff standing nearby, and the court concluded that liability should not extend to insults, threats, or annoyances.

ly foreseeable when a therapist negligently fails to warn a mother of a patient's threat of injury to her, and she is injured as a proximate result, that her young child will not be far distant and may be injured or, upon witnessing the incident, suffer emotional trauma." (*Id.*, at p. 706.)

If a parent and child are foreseeable victims, what about others who witness an accident or an intentional tort and who thereby suffer emotional distress? Keeton and Prosser answer this inquiry saying: "If recovery is to be permitted, however, it is also clear that there must be some limitation. It would be an entirely unreasonable burden on all human activity if the defendant who has endangered one man were to be compelled to pay for the lacerated feelings of every other person disturbed by reason of it, including every bystander shocked at an accident, and every distant relative of the person injured, as well as all his friends." (Prosser & Keeton on Torts, *supra,* p. 366.)

▮▮▮ By parity of reasoning, in *Borer* v. *American Airlines, supra,* 19 Cal.3d 441, Justice Tobriner explained that if the right to consortium were extended to the children of the injured party, it would ". . . substantially increase the number of claims asserted in ordinary accident cases, the expense of settling or resolving such claims, and the ultimate liability of the defendants." (*Id.,* at p. 444.)

In *Ramirez* v. *Armstrong* (1983) 100 N.M. 538 [673 P.2d 822], the court concluded that there must be a marital or intimate familial relationship between the victim and the plaintiff, limited to husband and wife, parent and child, grandparent and grandchild, brother and sister, and to those persons who occupy a legitimate position in loco parentis. (*Id.,* at p. 825.) Therefore, where two children saw their father struck and killed in a crosswalk, they could recover. However, an unrelated child who also resided with the family and who also witnessed the accident could not recover.

▮▮▮ A spouse will of course be allowed recovery when he is present when his wife is struck and killed by another vehicle. (*Krouse* v. *Graham, supra,* 19 Cal.3d 59, 74-75.) ▮▮▮ Recovery has also been permitted where the percipient witness has contracted a common law marriage validly created in states which allow such marriages (*Etienne* v. *DKM Enterprises, Inc., supra,* 136 Cal.App.3d 487, 489-490 (by implication), or where the witness sees a brother or sister sustain injury (*Rickey* v. *Chicago Transit Authority* (1981) 101 Ill.App.3d 439 [428 N.E.2d 596]; *Goncalvez* v. *Patuto* (1983) 188 N.J.Super. 620 [458 A.2d 146, 151]; *Walker* v. *Clark Equipment Co.* (Iowa 1982) 320 N.W.2d 561 [31 A.L.R.4th 158]; *Landreth* v. *Reed* (Tex.Civ.App. 1978) 570 S.W.2d 486, 490).) Grandparents have been allowed recovery where they were also injured in a fireworks explosion

where they witnessed injuries to the child, and where they shared a very close and family relationship with the deceased child (*Genzer* v. *City of Mission* (Tex.Civ.App. 1983) 666 S.W.2d 116, 122). A child was allowed to sue, under Hawaiian law, where he witnessed a car strike his stepfather's mother, who lived in the same home, and who was treated as if she was the child's natural grandmother. (*Leong* v. *Takasaki* (1974) 55 Hawaii 398 [520 P.2d 758, 766, 94 A.L.R.3d 471].)[9]

In *Mobaldi* v. *Regents of the University of California* (1976) 55 Cal.App.3d 573 [127 Cal.Rptr. 720], disapproved on other grounds in *Baxter* v. *Superior Court, supra,* 19 Cal.3d 461, 466, the plaintiff foster mother had held her foster child son in her arms while hospital personnel negligently administered a glucose solution 10 times the safe strength. The child was about three and a half years old and had been in plaintiff's care since he was five months old. While plaintiff was holding the child he went into convulsions and became comatose, suffering irreversible brain damage. The foster parent had attempted to adopt the child but had been frustrated by a county policy against adoption of seriously ill children. Note, that when the child was baptised, he was christened with the foster parent's last name. Personnel of the medical center had referred to plaintiff and the child as "mother and child." (*Id.,* at pp. 577-578.)

The *Mobaldi* court concluded that under those facts, the foster mother could recover since the relationship, known to defendant, possessed all of the incidents of those enjoyed by a natural parent child relationship. (*Id.,* at pp. 582-583.)

On the other hand a 14-year-old girl who witnessed her best friend's death in a water-skiing accident was denied recovery even though they were frequently in each others homes, and the plaintiff claimed to hold her friend's life as dear as she would have a natural sister. The court reasoned that "[t]o allow persons having a relationship to the victim 'akin to a family relationship' to recover for emotional distress caused by witnessing the injury to the victim would abandon the *Dillon* v. *Legg* requirement that the courts mark out the areas of liability excluding the remote and unexpected. [Cita-

---

[9]In *Barnes* v. *Geiger* (1983) 15 Mass.App. 365 [446 N.E.2d 78], the plaintiff saw a car strike a pedestrian and toss him in the air near where her 13-year-old son and 10-year-old daughter had gone ice skating. Convinced that the victim was her son, she went to the scene to rescue the injured party. She was mistaken, as the stricken child was an unrelated 15-year-old boy. She died the next day. The court denied liability, reasoning that danger invites rescue and accidents invite onlookers. It was not reasonable to extend the rescue doctrine to all who run to the scene of a calamity on the chance they might be able to do good, or to allow recovery to an unrelated person, who mistakenly believes that her child has been hurt. (*Id.,* at pp. 81-82.)

tion.]" (*Kately* v. *Wilkinson* (1983) 148 Cal.App.3d 576, 585 [195 Cal.Rptr. 902].)

In *Trapp* v. *Schuyler Construction* (1983) 149 Cal.App.3d 1140 [197 Cal.Rptr. 411], the court also denied recovery to first cousins who had a close emotional attachment to the victim and also played with him.

In this case, Jennifer Ledger and Richard Arters lived together since Jennifer was 15½ years old. Twice they planned to be married, once with her parents' consent. The second attempt was frustrated by a technicality. She bore his child. She was in the vehicle when Richard was stabbed and he died in her arms.

In our opinion, it is foreseeable, as a matter of law (*Hedlund* v. *Superior Court, supra,* 34 Cal.3d 695, 705-706), that when defendant drew his knife, and stabbed Richard, that the woman a few feet distant seated in the vehicle was likely a loved one who would suffer extreme emotional distress when Richard died in her arms. A tortfeasor who acts so viciously and callously should not gain immunity merely because their marriage license was never recorded in some county recorder's office. If defendant would have been liable to her for intentionally inflicting mental distress upon a person who was known to be present, we see no reason whatever to deny recovery simply because his victim is suing for negligently inflicting mental distress.

In 1982 the voters enacted the Victim's Bill of Rights. The preamble of article I, section 28, subdivision (a) of the California Constitution states, in pertinent part, as follows: "The People of the State of California find and declare that the enactment of comprehensive provisions and laws ensuring a bill of rights for victims of crime, including safeguards in the criminal justice system to fully protect those rights, is a matter of grave statewide concern. The rights of victims pervade the criminal justice system, encompassing . . . the right to restitution from wrongdoers for financial losses suffered as a result of criminal acts . . . ."

In light of this strong public policy, it would be sheer folly to suggest that Jennifer should be held in low esteem as a victim merely because her earlier plans to marry Richard went awry.[10] As to her obvious grief, we believe the following statement from *Portee* v. *Jaffee* (1980) 84 N.J. 88

---

[10]Because Jennifer had a close relationship to Richard, and was present during the actual commission of the crime, she could recover for emotional injuries from the state restitution fund, such as psychiatric expenses if they are not reimbursed from other sources. (Gov. Code, § 13960, subds. (a)(3), (b), and subd. (d)(1).) It would be strange indeed if the other remedy contemplated by the Legislature, namely compensation by the wrongdoer, was not recognized in our jurisprudence.

[417 A.2d 521] is illuminating: "The knowledge that loved ones are safe and whole is the deepest wellspring of emotional welfare. Against that reassuring background, the flashes of anxiety and disappointment which mar our lives take on softer hues. No loss is greater than the loss of a loved one, and no tragedy is more wrenching than the helpless apprehension of the death or serious injury of one whose very existence is a precious treasure. The law should find more than pity for one who is stricken by seeing that a loved one has been critically injured or killed." (417 A.2d at p. 526.)

We acknowledge that the majority in *Drew* v. *Drake* (1980) 110 Cal.App.3d 555 [168 Cal.Rptr. 65], reached a contrary conclusion. There, plaintiff and the decedent lived together as "de facto spouses" for three years and that plaintiff suffered emotional distress when she witnessed a vehicular collision in which he was killed. Justice Christian said: "No reported decision extends the 'close relationship' guideline to include friends or housemates. It has nevertheless been argued that the alleged relationship of housemates might be regarded, at least for the purposes of withstanding a demurrer, as a close relationship. But the Supreme Court used the term 'close relationship' as a limitation of potential liability in the context of parent and child. To allow persons standing in a 'meaningful relationship' (to use a contemporary colloquialism) to recover for emotional distress resulting in physical injury would abandon the *Dillon* requirement that '[t]he courts . . . mark out the areas of liability, excluding the remote and unexpected.' (68 Cal.2d at p. 741.)" (*Drew* v. *Drake, supra,* at p. 557.)

Justice Poché dissented. He reasoned that while the Supreme Court had required that the plaintiff and the victim were "closely related, as contrasted with the absence of any relationship in the presence of only a distant relationship (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 741), the majority had rewritten the standard to require a formal marriage relationship. (*Id.,* at p. 558.) Acknowledging the large number of cohabitating couples, he stated: "The insistence on adherence to an older morality as the key to the courtroom was discarded shortly after the close of the Spanish inquisition and is clearly not the law of this state. [Citations.]" (110 Cal.App.3d at p. 559.)

While the *Drew* majority painted with a broad brush, it is elementary that the language used in any opinion is to be understood in light of the facts and issues before the court. (*Porter* v. *Bakersfield & Kern Elec. Ry. Co.* (1950) 36 Cal.2d 582, 590 [225 P.2d 223].) In this case, it should be acknowledged that Jennifer has presented facts which are different from those presented to the *Drew* court, namely two attempts to marry the decedent, her decision to bear his child, her economic dependence upon the decedent,

the appalling facts relating to the sudden assault, and his subsequent death in her arms.

The *Drew* majority proceeded upon an unspoken first premise, namely that the trial period preliminary to marriage is inherently unstable. (Cf. *Marvin* v. *Marvin, supra,* 18 Cal.3d 660, 683.) We, of course, must acknowledge that while the airwaves are full of ballads voiced in countless languages celebrating love, the flame can flicker, and then die out. Juliet admonished Romeo:

"O! Swear not by the moon, the unconstant moon,

"That monthly changes in her circled orb,

"Lest that thy love prove likewise variable." (The complete works of William Shakespeare (Avenal Books 1975) Romeo and Juliet, p. 1021, col. 1.)

Yet, in a recent case dealing with an unmarried couple, our Supreme Court said: "It is difficult to conceive of a more fundamental family relationship than one which is created when two parents establish a home with their natural child." (*MacGregor* v. *Unemployment Ins. Appeals Bd., supra,* 37 Cal.3d 205, 212.)

Where, as here, we are presented with an intense youthful love affair, who are we to scorn their true love, which is now cast upon the sea of memories?

## DISPOSITION

The order sustaining the demurrer to the second cause of action for loss of consortium is affirmed. The judgment of dismissal based upon the order sustaining the demurrer to the third cause of action for negligent infliction of mental distress is reversed.

Stone, P. J., concurred.

**GILBERT, J.,** Concurring and Dissenting.—I respectfully dissent from that portion of the majority opinion that disallows a cause of action for loss of consortium. Because of the short interval between the injury suffered by Richard Arters II, and his death, the following discussion may be academic, but we are concerned only with whether Jennifer Ledger may state a cause of action for loss of consortium. I think she may.

The majority gives as its most significant reason for failing to follow *Butcher* v. *Superior Court* (1983) 139 Cal.App.3d 58 [188 Cal.Rptr. 503], the vagueness of the standard it provides. It suggests that courts and juries will be confused by the standard and have to guess at its meaning. I submit it is no more difficult for a jury to determine what a "stable and significant" relationship is than it is for it to apply the reasonable doubt standard in a criminal case, or the reasonably prudent person standard in a negligence case.

In *MacGregor* v. *Unemployment Ins. Appeals Bd.* (1984) 37 Cal.3d 205 [207 Cal.Rptr. 823, 689 P.2d 453], our Supreme Court found that Mac-Gregor, an unmarried woman, left her employment in California for good cause so that she could live with her fiance, Bailey, and their minor child in New York. Although the trial court was not faced with an application of the *Butcher* standard, it had no difficulty in finding the establishment of a family unit: "The evidence here amply supports the trial court's findings that MacGregor had 'established a family unit consisting of herself, her fiance and their child' and that she 'chose to relocate to New York with her fiance and their child in order to maintain and preserve their family unit.' The record shows that MacGregor and Bailey had maintained a common household for over two years prior to the birth of their daughter. When the child was born the parents received her into that home and gave her Bailey's surname. It is clear that both MacGregor and Bailey intend to and do provide a stable and secure home for their daughter." (*MacGregor* v. *Unemployment Ins. Appeals Bd., supra,* 37 Cal.3d 205, 212-213.) This very language evidences a finding of a stable and significant relationship between MacGregor and Bailey. The *Butcher* standard would be easy to apply in the *MacGregor* case, and it would be easy to apply here.

The elements that comprise consortium such as loss of support or services, love, companionship, affection, society, sexual relations, and solace, are as palpable and as real to Jennifer Ledger as if she had been married to Richard Arters II. They had tried to get married and they lived together with their son as a family. They differed from a married couple only in that they did not have a marriage certificate in the dresser drawer. It is both unrealistic and unduly optimistic to assume that such a certificate must be a prerequisite before one may produce evidence of the loss of those qualities of comfort, affection, love, and companionship enunciated in *Rodriquez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669].[1]

---

[1]"But let us be very strange and well bred: let us be as strange as if we had been married a great while, and as well bred as if we were not married at all." William Congreve, The Way of the World, Act IV, Scene V. See also, Meade, *Consortium Rights of the Unmarried: Time for a Reappraisal* (1981) 15 Fam. L. Q. 223.

To deny recovery here is to apply the law rigidly, mechanically, and without regard to present day reality. In *MacGregor,* the Supreme Court recognized that, "[i]t is difficult to conceive of a more fundamental familial relationship than one which is created when two parents establish a home with their natural child. According to Black's Law Dictionary, 'family' 'most commonly refers to group of persons consisting of parents and children; . . .' (5th ed. 1979.) In *Moore Shipbuilding Corporation* v. *Industrial Accidents Commission* (1921) 185 Cal. 200, 207 . . . this court stated that 'family' may 'mean different things under different circumstances. The family, for instance, may be . . . a particular group of people related by blood or marriage, or not related at all, who are living together in the intimate and mutual interdependence of a single home or household. . . .' This court has recognized that 'the family is the basic unit of our society, the center of the personal affections that ennoble and enrich human life. It channels biological drives that might otherwise become socially destructive; it ensures the care and education of children in a stable environment; it establishes continuity from one generation to another; it nurtures and develops the individual initiative that distinguishes a free people.' (*De Burgh* v. *De Burgh* (1952) 39 Cal.2d 858, 863-864. . . .)" (*MacGregor* v. *Unemployment Ins. Appeals Bd., supra,* 37 Cal.3d 205, 212.)

The *MacGregor* court did not need a marriage certificate to know a family when it saw one. It would be just as easy for a trier of fact to apply the *Butcher* standard and find that a stable and significant relationship existed in the instant case.

To follow the *Butcher* case and allow Jennifer's cause of action to stand would not topple or undermine the institution of marriage. While some persons may marry for cynical reasons, I doubt that the possibility of pleading a cause of action for loss of consortium for some potential future injury is one of them. (See *Bulloch* v. *United States* (D.N.J. 1980) 487 F.Supp. 1078, 1087.)

To deny recovery here because of the absence of a marriage certificate supplies a windfall to tortfeasors who may fortuitously injure the partner of an unmarried couple rather than a married one. The party who has suffered a real loss, such as Jennifer Ledger, goes uncompensated. The rule stated in *Butcher* does not set in motion an avalanche of litigation, because as Jennifer points out, the *Rodriquez* court limits liability to foreseeable risk. In *Rodriquez,* the court stated that, ". . . one who negligently causes a severely disabling injury to an adult may reasonably expect that the injured person is married and his or her spouse will be adversely affected by that injury. In our society the likelihood that an injured adult will be a married man or woman is substantial, [fn. omitted] . . . [a]nd the probability that

the spouse of a severely disabled person will suffer a personal loss by reason of that injury is equally substantial." (*Rodriquez* v. *Bethlehem Steel Corp.*, *supra,* 12 Cal.3d at p. 400.) In today's society it is equally foreseeable that an injured person may be living with an unmarried partner with whom that person has a stable and significant relationship.

The absence of bright lines in *Butcher* does not trouble me as it does the majority. It is true that bright lines are helpful in fashioning rules that offer certainty and predictability in the law, but if these lines are too bright, they may blind us to reality and to a just result.